# FEDERAL POWER COMMISSION ET AL. v. INTERSTATE NATURAL GAS CO. ET AL.

NO. 109.

Argued January 11, 1949.—Decided April 18, 1949.

*Bradford Ross* argued the cause for petitioner in No. 109. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Stanley M. Silverberg, Paul A. Sweeney, Melvin Richter* and *Howard E. Wahrenbrock.*

*John P. Randolph* argued the cause and filed a brief for petitioner in No. 188.

*William C. Wines* argued the cause for the Illinois Commerce Commission, petitioner in No. 212. *George F. Barrett,* Attorney General of Illinois, and *Albert E. Hallett,* Assistant Attorney General, were on the brief.

*Charles C. Crabtree* submitted on brief for petitioner in No. 209.

*William A. Dougherty* argued the cause for the Interstate Natural Gas Co. et al., respondents. With him on the brief for the Interstate Natural Gas Co. were *Henry P. Dart, Jr.* and *James Lawrence White.* *Mr. Dougherty* and *Mr. White* also filed a brief for the Mississippi River Fuel Corp., respondent.

*John T. Cahill* argued the cause for the Memphis Natural Gas Co., respondent. With him on the brief were *Edward P. Russell, Thurlow M. Gordon* and *Harold F. Reindel.*

*Forney Johnston* argued the cause for the Southern Natural Gas Co., respondent. With him on the brief was *Jos. F. Johnston.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case, here on certiorari, involves the proper disposition of a fund accumulated under a stay order issued

by the Court of Appeals pending review of a rate order issued by petitioner. That order reduced the rates for natural gas on sales by Interstate Natural Gas Co. to Mississippi River Fuel Corp., Southern Natural Gas Co., and United Gas Pipe Line Co. for resale to Memphis Natural Gas Co., and on sales by Interstate to Memphis. The Court of Appeals sustained the order, 156 F. 2d 949, and we affirmed its judgment, 331 U. S. 682.

Interstate deposited in the registry of the court pending review the monthly difference between payments under existing rates and those required under the order of the commission. Interstate has now moved in the Court of Appeals for a distribution of the fund. The pipe-line companies—Mississippi, Southern, United,[1] and Memphis—claimed the fund and asked that it be distributed to them. Petitioner and certain state and municipal agencies also intervened, opposing distribution to the pipe-line companies and claiming that it should be made to the ultimate consumers of the gas or to such others as may be equitably entitled to it. The Court of Appeals, relying on *Central States Co.* v. *Muscatine,* 324 U. S. 138, ordered the fund to be paid to those from whom Interstate wrongfully exacted the payments, *viz.,* the pipe-line companies, without prejudice to such rights as others may have to hold those companies accountable for the amounts involved. 166 F. 2d 796.

*First.* Here, unlike *Central States Co.* v. *Muscatine, supra,* the distributing companies that seek return of the fund created from their payments of the excessive rates are subject to the jurisdiction of the Federal Power Commission, since they are natural gas companies engaged in the transportation or sale at wholesale of natural gas in interstate commerce. See *Illinois Gas Co.* v. *Public Service Co.,* 314 U. S. 498. The claims of these pipe-

---

[1] United claimed an allocable share on behalf of Memphis to which it had resold the gas which it had purchased from Interstate.

line companies to the fund are therefore determinable solely with reference to federal law, since the Natural Gas Act, 52 Stat. 821, 15 U. S. C. § 717, is designed to regulate the segment of the industry occupied by such distributors. See *Interstate Natural Gas Co.* v. *Federal Power Commission,* 331 U. S. 682, 689–690; *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U. S. 591, 610. We may not therefore sustain the action of the Court of Appeals unless it is clear as a matter of federal law that the pipe-line companies are entitled to the fund.

The basis of the claim stated in their petitions for intervention is that they are entitled to the fund as of right, since it was created by their payments. But we would be unmindful of the purpose of the Act and the responsibility of the federal courts under it, if we so ruled. The aim of the Act was to protect ultimate consumers of natural gas from excessive charges. See *Federal Power Commission* v. *Hope Natural Gas Co., supra,* at 610, 612. They were the intended beneficiaries of rate reductions ordered by the federal commission, though state machinery might have to be invoked to obtain lower rates at the consumer level. The rates charged a wholesaler are part of its costs, reflected in its rate base. Reduction of those costs normally will lead in due course to reduction in its resale rates, unless we are to assume that the passage of the Natural Gas Act was an exercise in futility. It is of course conceivable that a wholesaler might be warranted in keeping all or a part of the rate reduction under the standards of reasonableness prescribed by the Act. But a court would not be warranted in assuming that the rates which have been charged are so low as to be unreasonable. No such presumption attends rates which have been fixed pursuant to rate orders of the commission. Nor can we make any such presumption as respects rates fixed

by the utilities themselves without the compulsion of a rate order. For experience does not indicate that utilities are wont to charge themselves out of business.

The pipe-line companies in their petitions for intervention make no claim that their rates have been so low that they are entitled to these refunds as a matter of law. Were that issue tendered, the court would need to resolve it and could call upon the Federal Power Commission for information relevant to it. Moreover, if the pipe-line companies passed on to their customers the rate reductions from the date of the commission's order (as Mississippi alleges it did), they would be entitled to a return of the payments they made into the fund. They would then have done all that was in their power to effectuate the policy of the Act in this regard. But apart from those exceptions, it is the duty of the court to look beyond those companies for the rightful claimants of the fund. It is the responsibility of the court which distributes the fund accumulated under its stay order "to correct that which has been wrongfully done by virtue of its process." *United States* v. *Morgan,* 307 U. S. 183, 197. That responsibility plainly cannot be discharged by payment of the fund to those who show no loss by reason of the court's action.

It is said that the federal court could not by-pass the pipe-line companies without undertaking to pass on the reasonableness of the rates which they have charged— a matter beyond its competence except on review of orders of the commission. But it is not rate-making to determine the equity of the claim of the pipe-line companies to the fund. The federal court, through exercise of its power under § 19 of the Act, issued the stay order under which the fund was accumulated. When a federal court of equity grants relief by way of injunction it has a responsibility to protect all the interests whom its injunction may affect. *Inland Steel Co.* v.

*United States,* 306 U. S. 153. It assumes the duty to make disposition of the fund in accord with equitable principles. *United States* v. *Morgan, supra,* at 191. If in a particular case the court reaches the question of reasonableness of rates, it does so only for purposes of distributing the fund for whose creation it alone was responsible. It does not fix or prescribe rates for the past or the future. The reasonableness of rates charged by the companies who claim the fund is wholly ancillary to the problem of determining what claimants are equitably entitled to share in it. See *Atlantic Coast Line R. Co.* v. *Florida,* 295 U. S. 301; *United States* v. *Morgan, supra.*

*Second.* The problem is somewhat more complicated if distribution of the fund is to be made to claimants other than the pipe-line companies. The latter sell gas to at least two types of customers—industrial users over whose rates the Federal Power Commission has no jurisdiction[2] and over which state regulatory bodies may or may not, depending on local law; and numerous distributing companies selling to customers in eight states. If the pipe-line companies had passed the rate reductions on to the distributing companies, those reductions may or may not have reached the ultimate consumers. We likewise do not know whether the reductions would have reached the industrial users either by terms of the contracts or by virtue of the assertion of regulatory authority.

If in this situation local law provides a standard for determining which of two or more claimants would have been entitled to the benefits of the rate reduction, the federal court should apply it. If clear and speedy state remedies are available, the federal court might hold the fund until those having the final say on the state law questions have spoken. Cf. *Thompson* v. *Magnolia Petroleum Co.,* 309 U. S. 478, 483; *Spector Motor Co.* v.

[2] § 1 (b).

*McLaughlin,* 323 U. S. 101. But in absence of such a showing the federal court in the interest of dispatch should proceed to determine the questions, relying on such sources of local law as may be available, including information from state regulatory agencies. The federal court may in its discretion disburse the funds directly to either the local distributing companies or the ultimate consumers or work out an administrative scheme whereby the distribution is made pursuant to directives of state agencies.

In conclusion, the task of the federal court in distributing the fund accumulated by virtue of its stay order is to undo the wrong which its process caused. The basic problem, therefore, is not to fix rates but to determine who suffered a loss as a result of the court's action in granting the stay. What in fact would have happened as a consequence of federal or state law if the stay had not been issued, no one can know for a certainty. But the federal court must make its prognostication, whether an excursion into federal or state law questions is entailed. Distribution of the fund should not involve prolonged litigation. It is an administrative matter involving the exercise of an informed judgment by the federal court and should have the flexibility and dispatch which characterize the administrative process.

*Reversed.*

MR. JUSTICE FRANKFURTER, concurring.

While agreeing in substance with MR. JUSTICE DOUGLAS' opinion, because of the conflict of views to which the case has given rise I deem it desirable to spell out with particularity what I regard as the controlling considerations.

1. The controversy concerns the proper disposition of a fund impounded in the Court of Appeals by virtue of the court's suspension of a rate reduction order of the

Federal Power Commission. Interstate paid into the registry of the court the sums collected by it in excess of the rates fixed by the Commission. After the order was finally sustained Interstate moved the court for distribution of the fund to the three companies which, as customers of Interstate, paid the unlawfully exacted amounts. The motion was supported by the three purchasers from Interstate; it was resisted by the Federal Power Commission which asked that distribution be made to the ultimate consumers; it was also resisted by the City of Jackson and by the regulatory commissions of Illinois and Missouri, which likewise urged that distribution be made to the ultimate consumers within their respective territories. One of Interstate's purchasers, United Gas Pipe Line Company, although intervening as a claimant, advised the court that it would pass on its share of the refund to the Memphis Natural Gas Company, to which United had resold the gas purchased from Interstate.

2. The court below thus had before it claims upon the fund by two immediate purchasers from Interstate, which asserted their right to the amounts paid into the fund by them, by a third purchaser from Interstate which made claim upon the fund but merely as a conduit for its passage to a subpurchaser, and by public agencies—national, state and municipal—which urged that the entire fund be distributed to the ultimate consumers.

The respondents—Interstate and the three immediate purchasers from it—basically rely on *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.,* 245 U. S. 531, in urging that the fund should go to the immediate depositors from whom it was found to have been wrongfully exacted. They deem that case to be the foundation of our decision in *Central States Electric Co.* v. *City of Muscatine,* 324 U. S. 138. The Government on the other hand asks that the *Muscatine* case be overruled and that the fund should go to the ultimate consumers.

In the *Muscatine* case this Court rejected the notion that as between a utility like Interstate and its immediate purchasers a rate reduction makes the distributors mere conduits of the reduction for the exclusive benefit of the ultimate consumers. In short, the rationale of the *Muscatine* case is that that which is in fact not true in the process of rate-fixing ought not to be erected into a principle of law merely because the effect of a rate reduction is postponed through an exercise of the right to judicial review afforded by the Congress.

3. It would, therefore, appear to be clear that the judicial duty is to deal fairly with a trust fund held to await the outcome of judicial review to the end that it may be distributed on the basis of what would have taken place had the Power Commission's order gone into effect at once.

The task, then, for the Court of Appeals is to reconstruct, as far as it can possibly be done, what would have happened had no fund accrued. Reasons of equity produced the fund; equitable considerations must determine its distribution. The governing principle is that of unjust enrichment. Since the task of the court is to place the parties in the position in which they would have been had there not been a postponement of the effective date of the rate reduction, it is now the duty of the court to make that retrospective determination not by unfounded assumptions erected into rigid legal rules, but by an ascertainment of what actually would have happened contemporaneously had purchasers from Interstate obtained their gas at the lower rate.

4. A utility is entitled to charge a reasonable rate. It would be dealing with a fiction and not a fact to hold as a matter of law either that the immediate purchasers from Interstate should keep the benefit of the reduced rate or that it should all go to the ultimate consumers. Whether the three purchasers or the intervening distribu-

tors are entitled to any part of the reduction depends on the ascertainable condition of the three purchasers from Interstate and the intermediate purchasers from them. A merely compensatory rate below which no rate may be fixed by a regulatory commission may not be a reasonable rate. See Brandeis, J., in *Southwestern Bell Telephone Co.* v. *Public Service Commission,* 262 U. S. 276, 296. For various reasons a utility may charge, as is well known, less than what as a matter of law it could be compelled to charge. On the other hand, it may charge the maximum of what is reasonable.

To distribute the entire fund among the immediate purchasers from Interstate may give them a complete windfall, since they might have been compelled, under their duty to charge only a reasonable rate, to reduce their rates so as to keep none of the Interstate reductions. Since all these purchasers are subject to regulation by the Power Commission, the Power Commission could have ordered such rate reductions in whole or in part. On the other hand, to take it all away from them now might work an injustice because they might have been allowed to keep at least part of the reduction. As to the intermediate purchasers that were not subject to the Federal Power Commission, the allowable retention of any part of a reduced rate from a distributor would have turned contemporaneously on state law. To deny both these classes of the intermediate purchasers the right to establish just claim against the fund and to distribute it all among the consumers, moreover, would inevitably leave a sizable unclaimed amount, and this, of course, would have to go to the depositors as the residuary claimant—it would have to go, that is, to Interstate, the one party least entitled to any of the fund.

These arbitrary alternatives—to distribute the whole fund to the immediate purchasers from Interstate or to distribute it all to the ultimate consumers—have at least

the support of logic though not of justice. A suggested compromise—to go beyond the immediate purchasers and at the same time stop short with those purchasers over whom the Federal Power Commission has authority— is said to be justified by the fact that a federal court cannot engage in rate regulation. This suggestion has the support neither of logic nor of justice. If a federal court is barred from inquiring, because such an inquiry amounts in effect to rate regulation, what would have been the consequences to all those affected had the reduction of Interstate's rate gone into immediate effect, rates administered by the Federal Power Commission should be no more open to such an inquiry than are those beyond the power of the Commission. And if it would be unjust to let an immediate distributee which had passed on the higher rate to its purchasers retain the benefit of the reduction, it would be equally unjust to let any succeeding distributee which had done the same thing enjoy the benefit merely because it was the last distributee subject to the Commission's jurisdiction.

At all events, in preventing unjust enrichment a court of equity is not exercising the functions of rate-making; it is neither awarding reparations for the past nor fixing a future schedule as does a rate-regulating body. Granting that a federal court does not have the power to regulate rates, it does not follow that in discharging the duty to distribute a fund of its own creation it is barred from an inquiry which has some aspects—though I believe very minor ones—that would also appear in a rate proceeding. In short, issues that may be pertinent to a rate investigation before a regulatory commission are not therefore beyond the power of judicial inquiry when they arise in a totally different relation.

5. Accordingly, the task for the court below is to determine in 1949 how the Interstate rate reduction would have affected all the intermediate distributors in '43 and

'44 had it not been suspended by the court's injunction. The Court of Appeals has inherent powers to bring to its aid all effective means to discharge this task. This Court, in *Ex parte Peterson*, 253 U. S. 300, showed the resources available to our District Courts even in an action at law when due regard must be had for the requirements of the Seventh Amendment. The more clearly available are procedures for doing justice where a court of equity is called upon to distribute a trust fund of its own creation.

In the light of the foregoing, the Court of Appeals should ask the Federal Power Commission for an advisory report as to what the Commission might have determined had it in the original proceeding for the reduction of the rates of Interstate exercised its power to bring in all the parties. There is nothing novel in this. District Courts may call upon the Federal Trade Commission to help shape decrees in Sherman Law cases. To be sure, the Clayton Act explicitly so provides. But a court of equity has inherent powers to invite such help from a great agency of the Government. While the Federal Power Commission could, if it chose, decline to render that help, it is inconceivable that it would do so. As to the intermediate purchasers, subject not to the Power Commission but to State or city regulation, the local agencies could be similarly resorted to for aid in the ultimate problem before the lower court of distributing a commingled fund as to which none of the interested parties can fairly be said, as a matter of law, to have an obvious, demonstrated claim.

Various obstacles are conceived to stand in the way of the lower court's fulfillment of this task. But it is, to say the least, premature to conjure up abstract difficulties which, as a practical matter, may evaporate in the light of the informed advice which these various regulatory agencies may be able to furnish readily on the

basis of their available records of the financial condition of the utilities subject to them.   It will be time enough to distribute the fund by some makeshift rule of thumb if what is concededly a rule of intrinsic fairness should be found judicially unenforceable.   Accordingly, I would remand the case to the Court of Appeals to take steps consistent with the foregoing views.

By Mr. Justice Jackson.

Mr. Justice Burton and I view this case in a different light than do any of our brethren but we have joined in the judgment and the opinion of Mr. Justice Douglas because we deem it important that instructions to the court below carry the concurrence of a majority of this Court.   We agree with much but not all of that opinion and where our views differ we are closer to that opinion than to other views expressed here.   We repeat our concurrence so that there may be no misunderstanding but wish also to express for the record our individual views.

The way this case appears to us is this:

1. The three pipe-line companies whose excessive payments made up this fund may not, under the terms of the impounding order, have an absolute right to recover it.   However, since this Court found that the money was illegally exacted from them, it would seem to make at least a *prima facie* case for returning it to their possession. The minimum to which they are entitled is a chance to be heard as to whatever claim they may have to it.   As these companies are subject to the Federal Natural Gas Act, a federal court might properly weigh their claims under federal law.

2. Assuming, however, what is not improbable, that none of the pipe-line companies establishes a claim to the fund, the next in right to receive it would be their customers, the local distributing companies.   The latter

are under protection of federal law as to the rates which may be exacted from them by the pipe-line companies but are in no respect under federal law as to the rates they may charge customers. If all of the federal power exerted in the Natural Gas Act had been exercised by the Federal Power Commission, it could not reach or control their customer relations. We do not see, therefore, how a federal court in this litigation can derive from the Act any greater power to enter the local field with refunds than the Power Commission had to enter it for rate-making. There are many legal and practical reasons why the court's function should not be expanded beyond the point where Congress ended the functions of the Power Commission.

3. The manner and amount by which any repayments to distributing companies would be reflected in reduced rates to consumers, and therefore in rebates, is exclusively for state law. Twenty-one of these distributing companies are involved and they operate in eight states, each with its own principles to govern local rate-making and separate authorities to apply them. We solve no problem by saying that computation of this refund is not rate-making. Of course it is not, but it is so like unto it that no one suggests that any body of law except that of rate-making is applicable. Disguise it with what sophistry we will, the disposition of refunds as between operating companies and customers must be generally based on the local law of rate-making or on no law at all. Some of these companies and their customers are located within the territorial jurisdiction of the Court of Appeals for the Fifth Circuit; others are in the Sixth, Seventh and Eighth Circuits. I know of no legal or practical justification for requiring the Fifth Circuit Court of Appeals to undertake interpretation and application as an original matter of the laws of eight states, several of them beyond its jurisdiction.

4. The application of these funds, if they are held to go to the local distributing companies, present difficult questions of policy which it is the responsibility of the states to resolve in their own ways. The federal court should not undertake to resolve them, even if they were less complex. These problems are not solved or evaded by saying that refunds shall go to consumers rather than to the companies. It oversimplifies these problems to treat consumers in the abstract as a class all alike. And it does not dispose of the problems to declare that refunds should be on "equitable principles" as if there were a defined and accepted body of principles of equity on this subject. Equity in the historical sense—equity jurisprudence—has no guidance to give beyond maxims, such, for example, as "equality is equity." But here, what is equality? Of course, what no doubt is meant is that the court should apply a sort of natural justice based on popular notions of right dealing. But this does not answer some of the concrete questions which someone must face in final disposition of these funds. I shall mention but few.

At the very outset one is faced with the question as to what is an "equitable" basis of refund as between industrial and domestic consumers. Direct sales to industrial consumers by the three pipe-line companies amounted to 63% of the total for Mississippi River Fuel Company, 18% in the case of Southern Natural Gas Company, and 11% for United Gas Pipe Line Company. In addition to this, other industrial consumers may be served by local distributing companies. The Federal Power Commission proposal, which this Court seems to think should prevail, is that refunds both to industrial and domestic consumers be calculated by dividing the money in proportion to feet of gas sold to each one. On this basis, the Power Commission's exhibit proposes a refund to direct industrial consumers alone of over a million dollars from this fund. The Commission does

not tell us the prices paid by various classes of consumers. But it is common knowledge that, for a variety of reasons, industries get a much lower price per m. c. f. than domestic users. If we assume it is 50%, then the refund would repay industrials twice as large a proportion of what they have paid for gas per m. c. f. as it would household users. Is this "equity"? In my dissent in *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U. S. 591, I pointed out the uneconomic use of gas in industry and the waste and exhaustion of irreplaceable natural resources that it causes, and the great differential that exists between their low contract price and the price paid by domestic users. I have great doubt whether the industrial users have any just basis for participating in this refund; but if they could, and they certainly are entitled to try, their share should not be greater than their proportion of the *revenues contributed*, rather than of their proportion of the *consumption*. The latter measures only the benefits they already have derived from exhausting the Nation's supplies, not at all what they have contributed to the fund. This Court refused to consider these equities, as did also the Power Commission, in the *Hope* case. Why not then leave the states free to solve the issue? Some of the states may have an intelligent policy with reference to the rapid depletion of our gas reserves, *vis-à-vis* domestic and industrial consumption, and the relation of price to uneconomic uses. The Federal Government has none.

The Power Commission has furnished a tabulation showing the share of each local distributing company under its theory. But it has not provided any of the data which would disclose the magnitude and complexity of the task it is asking us to visit upon the Court of Appeals by directing it to go beyond this and distribute each company's share among its consumers. By reference to Moody's Manual, however, we can learn the

approximate number of customers served by each company. Then by applying the Power Commission's tabulation of the share of refunds, it would appear that refunds for some companies would be so trivial that a state supervising authority might conclude that to cover this refund into the current revenues of the operating company for whatever effect it might have on its present or future rates would be a more sensible procedure than to spend it in expense of special proceedings to refund to consumers. For instance, Arkansas-Louisiana Gas Co. serves 142,481 customers in 109 communities. The Power Commission allocates it $20,911, or an average 15¢ per consumer. The Illinois Power serves 116,000 customers in 56 communities and is allocated $50,065, or about 43¢ per consumer. Birmingham Gas serves 61,000 consumers in 9 communities and is allocated $30,133, making an average refund of about 49¢.

The foregoing estimate of consumer refunds assumes an equal amount to each consumer. Another permissible basis, and I should think, a fairer one where substantial amounts were involved, would be a refund in ratio to the bills paid for gas. The Power Commission, however, if consistent, would use another method and refund in proportion to the feet of gas purchased by the consumer. Different local conditions precipitate some nice questions in applying any fair method as between consumers. From Moody's Manual, for example, we learn that one of the largest of the distributing companies, the Atlanta Gaslight Co., which serves approximately 133,000 consumers in 28 communities, has a graduated scale of rates, so that consumers pay different rates for gas consumed in different quantity brackets. I should think the practical effect of its schedule would be that a very large consumer would make an average payment much less per thousand feet than would a moderate household consumer. Equality of refund may not be equality of treatment. It will take

more than equalitarian generalities to get this cash into
consumers' hands. Is not the manner of refund under
such local conditions one to be worked out by local au-
thorities rather than the federal court of a distant circuit?

The problems do not end here. Consumers during
what period are entitled to refund? Certainly the rate
reduction which caused this fund to accumulate could
not in normal course have reached local retail consumers
until sometime after reduction in wholesale rates, and the
period would differ according to local conditions. The
individuals who are entitled to refund, for whatever
period may be adopted, must be identified and questions
settled as who is entitled to the refund of a deceased
consumer, what becomes of the share of one who has
removed or is unknown. Disputes between landlord and
tenant, husband and wife, and many other questions will
arise; all of which are for local authorities.

For these reasons it seems to us that the functions of
the federal court end when it has granted these refunds
to the last purchaser whose purchase price the federal
authority can lawfully reduce. This would be the dis-
tributing companies. From there on it is a local problem
with which neither the Power Commission nor the court
has any legitimate concern. The machinery of some of
the states may be somewhat inadequate for dealing with
the problem, but that does not, in our view, warrant
usurpation of their functions.

However, for reasons stated at the beginning of this
opinion, MR. JUSTICE BURTON and I have joined the
judgment and opinion of the Court.

MR. JUSTICE BLACK, concurring in part and dissenting
in part.

I concur in reversal of the judgment of the Court of
Appeals, but dissent from the directions given that court
for disposition of the impounded funds. In the first

place I think those directions rest on erroneous legal principles. Secondly, without precise definition of issues or standards, the directions impose an almost impossible task on the Court of Appeals, a task which is bound to dissipate a large part of the funds in diverse, protracted, involved and confused litigation. Furthermore, I see little assurance that the fund's remnant at the end of this litigation could ever reach the consumers who are in my judgment the equitable and legal beneficiaries of the funds.

Acting pursuant to the Natural Gas Act,[1] the Federal Power Commission ordered the Interstate Natural Gas Company to reduce its rates to certain wholesale pipe-line companies. Challenging this order as illegal, the wholesale companies sought and obtained from a District Court an injunction against enforcement of the rate reduction order. By reason of the injunction the pipe-line companies were compelled to continue to pay the higher gas rates. But the court required the Natural Gas Company to make monthly payment into court of amounts equal to the rate reduction. For more than four years these funds have been collected and paid into court. When this case was submitted the total amount collected was in excess of two and a half million dollars. The rate reduction order was sustained by this Court[2] and consequently Interstate is not entitled to and asserts no claim to the fund. The wholesale pipe-line companies claim it on the ground that but for the injunction they would have obtained the gas at the lower rate.[3] The

---

[1] 52 Stat. 821, 15 U. S. C. § 717.

[2] *Interstate Natural Gas Co.* v. *Federal Power Commission,* 331 U. S. 682.

[3] One pipe-line company claims to have passed on the rate reduction to its customers which if proved would put it in an entirely different category.

Federal Power Commission and certain state agencies here contend that since the purpose of the Natural Gas Act was to provide benefits to the ultimate consumers the total impounded funds should be distributed to the consumers.

*First.* I agree with the Court that the aim of the Federal Act was to protect ultimate consumers of gas from excessive charges. To protect the ultimate consumer, however, the Act went no further than to fix the interstate rates of producers and wholesalers. Congress intended that these federal rate reductions would lower the costs of gas to local retailers thus enabling state and local agencies to fix lower consumer rates on the federally fixed lower wholesale rates. Consequently, where courts leave the Act's scheme free to function, ultimate consumers of gas get no benefits from the federally reduced producer rates until and unless state or local authorities fix reduced rates for companies whose sales fall within their respective jurisdictions. Under such circumstances rate relationships and cost consequences as between consumers and dealers under state jurisdiction would raise questions of state law only. But here, the normal consequences of the valid federal rate reduction were not allowed to take place. The injunction placed an insuperable obstacle to state reduction of wholesale or retail rates on the basis of the federal rate reduction order. Thus the court's stay blocked the congressional mechanism intended to produce lower consumer rates. *Central States Co.* v. *Muscatine,* 324 U. S. 138, 149 (dissenting opinion). Furthermore, no practical remedy is available in the state courts or state or federal regulatory agencies to determine retroactively what is a proper distribution of the impounded funds. The judicial stay therefore effectually frustrated the congressional purpose to provide a timely opportunity for state or national

regulatory agencies to accord consumers the Act's benefits. Consequently, rights in the fund as between ultimate consumers and the pipe-line companies must be determined under the new situation created by the federal court.

*Second.* Differing from the Court, I think that distribution of the fund in this new situation is wholly a matter of federal law and that the fund should be distributed without a futile effort to determine the extent consumer rates might have been reduced by state or national regulatory agencies had they been left free to act on the reduced rate cost of gas. It was a federal court acting under authority of federal law that created the fund. And having deprived consumers of an opportunity to get the reduced rates Congress intended them to have as the result of an integrated federal-state course of conduct, it became the duty of the federal court to administer this fund under federal rules that would as nearly as possible afford these congressionally intended benefits to consumers. Nothing short of this will accord with the congressional purpose or with equitable principles by which the court must be governed in administering the fund. *Inland Steel Co.* v. *United States,* 306 U. S. 153; *United States* v. *Morgan,* 307 U. S. 183.

All gas the wholesale price of which was affected by the Commission's order had its ultimate price to the consumer fixed by law or by agreement of parties.[4] In neither event can it be assumed that the price paid failed to give the seller a reasonable value. Under such circumstances, where rates were fixed by law or contract on the basis of the high wholesale rate, neither statutes nor equitable principles require the Court of Appeals to seek standards of reasonableness different from those under which gas merchants voluntarily had already sold their product to

---

[4] As the Court points out, industrial purchasers' rates may not have been fixed by law but by contracts.

retailers and consumers. All regulatory statutes permit utilities to complain of unreasonable rates, and the failure of these utilities to prosecute claims for excess rates until this windfall was in sight should bar them from making retroactive claims now. And of course, where the price was fixed by voluntary contracts, the court should not be required to re-examine those contracts on the naive assumption that consumers took an unconscionable advantage of the pipe-line companies.

My belief is that under the circumstances here the only way even partially to carry out the purpose of Congress to afford consumer relief is by distributing this fund to the consumers. This itself will impose a tedious, onerous, and perhaps expensive burden on the court and the consumers. Such a burden, however, is one of the prices to be paid for the practice of judicial suspension of rate orders. But the burden in distribution to consumers would be small in comparison to that imposed by requiring the court in 1949 and 1950 to make expensive and extensive explorations to speculate on what rates state administrative agencies would have found reasonable in separate years from 1943 to 1947.[5] Neither the procedure I suggest nor that adopted by the Court can achieve with scientific accuracy the result that would have followed had the court not suspended the rate reduction order. But under the Court's plan to require the Court of Appeals to reconstruct hypothetical rate situations in several states a major part of the funds might be dis-

---

[5] How is this reasonableness to be determined, on the fair value theory, the reproduction cost theory, or some other theory? And how many more years would it take the Court to complete the several extensive inquiries required to reach its conclusions as to reasonableness of the prices charged by the several companies in the several states where they sold gas? See *McCart* v. *Indianapolis Water Co.*, 302 U. S. 419, 428–439 (dissenting opinion).

sipated in a costly but vain search for an unattainable goal.[6] Consumers at least can get a substantial part of the funds under the procedure I suggest.[7] Nor can I see any possible intrusion into state functions by following such a course.

Neither state laws nor state courts are responsible for the tangled situation here. I cannot see where it could possibly offend the states or encroach on their power for the federal court to distribute these funds to the very state people the federal law was passed to protect. And the state representatives here arguing for the distribution of this fund to the ultimate consumers, citizens of their states, are apparently unable to detect in distribution to these consumers any invasion of state rights by the federal courts.

This seems an appropriate time to reverse *Central States Co.* v. *Muscatine,* 324 U. S. 138. I regret to see that holding survive even in part.

MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE join in this opinion.

---

[6] It is interesting to note the unchallenged assertion in the Government brief that although in *Central States Co.* v. *Muscatine,* 324 U. S. 138, "this Court required that the way be left open for the ultimate consumers to utilize the remedies, if any, provided by local law, no such proceeding has been brought." The illusion that state relief is somehow available to the consumers here seems to persist despite the realities that consumers in the *Central States* case, similarly situated to the consumers here, have not received a dime from the "available" state remedies.

[7] Apprehension is expressed in this Court that the procedure I suggest would result in making the producing company the residuary beneficiary of funds not claimed by consumers. Such an apprehension is not justified since the Court of Appeals can direct any unclaimed consumer funds to be distributed to whatever company might show a superior equity.