INTERSTATE NATURAL GAS CO., Inc., v. FEDERAL POWER COMMISSION et al.

No. 10701.

United States Court of Appeals Fifth Circuit.

May 9, 1950.

834

Milton Mallin, Asst. Atty. Gen. of Illinois, Chicago, Ill., for Illinois Commerce Commission.

Wm. Dougherty, New York, N. Y., for Mississippi River Fuel Corporation.

Leslie Henry, Toledo, Ohio, for Owens-Illinois Glass Co., and various other respondents.

William R. Bascom, St. Louis, Missouri, for Granite. City Steel Co. & Laclede-Christy Co., respondents.

John P. Randolph, Jefferson City, Missouri, for Missouri Public Service Commission.

Lambert McAllister, special counsel, Federal Power Commission, Washington, D. C.; for Federal Power Commission.

Before HUTCHESON, Chief Judge, HOLMES, Circuit Judge, and CHRISTENBERRY, District Judge.

HUTCHESON, Chief Judge.

After the Supreme Court[1] had reversed the distribution order of this court,[2] Mississippi River Fuel Corporation, one of the pipe line companies from whom Interstate had collected the excess charges, undertook, in consultation with representatives of the Federal Power Commission, to work out, in substantial compliance with the opinion of the Supreme Court, an agreed plan for distribution of the returned excess charges it had paid Interstate.

The plan proposed distribution to the public utility companies for redistribution to their customers of all excess charges not already returned in lower rates, which, under the formula determined upon, were attributable to sales by Mississippi to public utilities.

As to excess charges of $939,580.17, attributable to gas sold direct by Mississippi to fifty-five industrial customers on private contracts, the plan proposed that since these sales were not regulated sales, and the contracts made no provision for price reductions, and none were due by state law, the amount of these charges should be distributed to, and retained by, Mississippi.

As to the sales to public utilities, the plan provided that it should be made effective by obtaining the agreements of the Federal Power Commission, of the public utility customers of Mississippi, and of the state regulatory commissions or boards in the states where the sales were made.

As to the industrial contract customers, the plan proposed that it be made effective by obtaining disclaimers from them.

The plan progressed to the point of obtaining the agreement of the Federal Power Commission and of the public utility customers in, and state regulatory bodies of, the states of Arkansas and Missouri, and disclaimers[3] amounting to $338,556.51 from twenty-two of its direct industrial customers, when it became apparent that, because of the inability to secure the consent of the Illinois Commission, an agreement could not be obtained from the two Illinois public utilities, and that many of the industrial customers would not sign disclaimers. Thereupon, Mississippi, attaching the plan[4] with the agreements and disclaimers it had obtained, and a form of

1. Federal Power Commission v. Interstate Natural Gas, 336 U.S. 577, 69 S.Ct. 775.

2. Interstate Natural Gas Co. v. Federal Power Commission, 166 F.2d 796.

3. The disclaimer form for direct industrial customers of Mississippi was used since Mississippi's counsel was of the opinion, an opinion with which the Missouri and Arkansas State Commissions and the Federal Power Commission are

in agreement, that no regulatory agency has jurisdiction over sales to them, and that, under the opinion of the Supreme Court, only the question of the right of these customers under their contracts to a rebate or retroactive adjustment was material.

4. The plan provided:
(1) That the total amount of money representing excess charges paid to Mississippi by Interstate is $1,484,582.53;

order distributing the funds exacted from it in accordance with the plan, filed in this court a petition for an order to show cause why the excess funds collected from Mississippi should not be distributed in accordance with the plan and the order attached.

Notice having been duly given to all interested parties, and those desiring to oppose the entry of the order sought having appeared, there was first an informal, preliminary, or pre-trial, inquiry, as to whether the appearances and pleadings were in proper form, and all parties were advised that they would be at liberty to file amendments at any time before the filing date set for their briefs if they were, or became, advised that their present pleadings did not suffice.

At the same time and in the same way, inquiry was made as to whether there were any controverted issues of fact, particularly as to whether there was any dispute with reference to the amounts set out in the petition and plan, whether any of the contracts contained provisions for price relief or reduction, and as to whether any

of the contracts had expired and been renewed since the entry of the Power Commission's rate reduction order, and, if so, whether, in renewing them, any efforts had been made to obtain a reduced price on the basis of the reduction.

Both of these inquires having been answered in the negative, and an understanding arrived at, that, as at present advised, none of the parties believed there were controverted issues of fact, but only questions of law, the parties were advised that if before the coming in of the briefs they should be of a different opinion and should desire to file affidavits or agreed statements as to facts, they could do so.

The issues being thus agreed upon, the oral argument was begun, and all persons, desiring to be, were fully heard.

The Illinois Commission and the Industrial customers, making common cause, did not at all contest the correctness of the excess amounts proposed to be distributed by the plan. Their prime position was that the opinion of the Supreme Court had made it clear: that Mississippi could not in any event retain for itself any of the excess

(2) That of this amount $300,898.66 represents amounts paid by Mississippi for gas, which it in turn sold for resale to public utility companies for the period from June 1, 1943, to Jan. 20, 1946, and $244,103.70 represents the amount of such sales from Jan. 21, 1946, to Sept. 30, 1947, making a total of $545,002.36 of purchases from Interstate applicable to sales made to utility companies for resale;

(3) That the remaining $939,580.17 is applicable to sales made by Mississippi directly to industrial consumers;

(4) That as to the sum of $244,103.70, mentioned above, as a result of a rate order against Mississippi, requiring it to reduce its billings, Mississippi has already given its utility customers the benefits of the Interstate reduction from Jan. 20, 1946, the time the Commission's order became effective in a rate case against Mississippi;

(5) That since the effect of such interim billing was to grant such benefit to Mississippi's utility customers, Mississippi is now entitled to receive said sum of $244,103.70;

(6) That the Federal Power Commission has no jurisdiction over rates for

gas sold by Mississippi directly to industrial consumers, and the stipulation of the Federal Power Commission applied only to the disposition of funds relating to sales for resale, and by the agreement it takes no position respecting the disposition of said sum of $939,580.17;

(7) That Mississippi has made an offer of settlement in respect of the distribution of the impounded funds by agreeing to pay its utility customers the total sum of $300,898.66, distributed as follows:

(a) *Arkansas Utilities*
Arkansas Power and Light Company ..................... $ 26,253.20
Arkansas-Louisiana Gas Co.... 11,774.43

(b) *Missouri Utilities*
Missouri Natural Gas Co........ $ 9,041.26
Laclede Gas Light Co........... 169,251.31
Laclede Gas Light Co., Successor to St. Louis County Gas Co. 54,505.45

(c) *Illinois Utilities*
Illinois Power Co................ $ 27,093.53
Union Electric Power Co........ 2,979.48

(8) That $174,852.81 of the amount due Mississippi has not been paid into the registry of the court by Interstate, but will be paid by it in accordance with the agreed judgment.

sums which had been collected from it; that it was the duty of the court in any event to direct that no part of the sums distributed, except the amounts that it had already given its public utility customers the benefit of, should be paid to Mississippi; and that it was, therefore, the duty of the court, under that opinion, to order the excess sums exacted distributed to or for the benefit of ultimate consumers, private industrial and public utility alike.

Their secondary position was that the Illinois Commission had regulatory powers over Mississippi, not only as to rates to be charged to public utility customers but those to be charged to industrial customers as well, and that under its power it could, and would, award reparation to the industrial customers in the amounts of these excess charges.

The Illinois Commission made a further insistence that if this court should be of the opinion that the industrial customers were not entitled to a refund of excess charges exacted by Interstate as to gas sold them, then, since Mississippi would not in any event be entitled to them, it should order these sums paid to the utility customers for distribution to their customers. As to this contention, since none of the gas, as to which these excess charges were exacted, had been sold to utility customers and by them to their customers, the Illinois Commission was somewhat at a loss to give any reason why, or any basis on which, this complete windfall should come to the customers of the public utilities. It also advanced a subordinate contention that Interstate should pay all costs of distribution.

The position of Mississippi, with which, as to sales in Missouri, the Missouri Commission was in full agreement, was: that the charges to industrial customers were not included in, or affected by, the Federal Power rate order; that such charges are not subject to state regulation; that the contracts under which these customers pur- chased gas provided for no reduction or rebate; and that thus they were not in law or equity entitled to receive any of the excess charges exacted of Mississippi under the Federal rate order.

The oral agruments concluded, the time fixed for the filing of briefs having elapsed, and the briefs and claims all in, it now appears that, of the fifty-five industrial customers, twenty-two, accounting for $338,- 556.61 in amount, signed disclaimers; seventeen, accounting for $115,171.61 in amount, did not appear in answer to the rule, but made default; and eleven,[5] accounting for $484,909.97, made answer to the rule, and, asserting claims have, (except one small claim, that of the St. Louis Screw & Bolt Co. for $1,942.08), appeared orally and by brief, asserting and arguing their right to the sums claimed.

The Power Commission agrees to the plan and order, that it had, and has, no jurisdiction or authority over the prices charged industrial customers, and that its rate order did not purport to affect or concern these prices. The State Commissions of Missouri and Arkansas likewise agree to the plan and that they are not interested in, or concerned with, the said sum. There is for decision in this court, then, only one main question, whether the eleven claimants to the $484,909.97, or any of them, are entitled to that sum or any part of it, and one subordinate one, that of the costs of distribution of the Illinois funds.

█ We have given the most careful attention to the contentions made. We find no basis in the opinion of the Supreme Court, or otherwise, in law or in equity, for the primary contention made by the contestants, that moneys collected from Mississippi in excess of a rate, whose validity is later upheld, can in no event be distributed to Mississippi. We think it quite plain that, at least, *prima facie,* these moneys are the property of Mississippi and must be distributed to it, unless su-

5. Of these, seven, accounting for $371,- 870.39 were Illinois direct industrial customers, and four, accounting for $114,- 981.66 were Missouri direct industrial customers.

perior claims to it, in law or in equity, are shown.[6]

A careful reading of the opinions of the members of the Supreme Court, who made up the majority, leaves us in no doubt that while there may be some difficulty in reconciling with each other the purport, the intent, and the effect of all the things said in the several opinions, there is none as to what the majority actually decided,[7] none as to the duty of this court in the premises, which is to find out in the best way it can and determine what law and equity, in each of the states where the money was collected, demands as to the just distribution of the excess funds collected by Interstate from Mississippi.

After giving the most careful consideration to the agreed facts, to the positions of the regulatory commissions, and to the respective contentions of the parties, in the light of what is said in the opinions of the Supreme Court majority,[8] we are in no doubt that there is no basis in the law of contract for ordering Mississippi to refund to its direct industrial customers any of the moneys it collected from them pursuant to these contracts. Valid when made, and remaining valid and binding throughout, unaffected by the Federal rate

6. "The three pipe-line companies whose excessive payments made up this fund, may not, under the terms of the impounding order, have an absolute right to recover it. However, since this Court found that the money was illegally exacted from them, it would seem to make at least a prima facie case for returning it to their possession. The minimum to which they are entitled is a chance to be heard as to whatever claim they may have to it. As these companies are subject to the Federal Natural Gas Act [15 U.S.C.A. § 717 et seq.], a federal court might properly weigh their claims under federal law." Federal Power Commission v. Interstate Natural Gas, 336 U. S. at page 590, 69 S.Ct. at page 782.

7. "In conclusion, the task of the federal court in distributing the fund accumulated by virtue of its stay order is to undo the wrong which its process caused. The basic problem, therefore, is not to fix rates but to determine who suffered a loss as a result of the court's action in granting the stay. What in fact would have happened as a consequence of federal or state law, if the stay had not been issued, no one can know for a certainty. But the federal court must make its prognostication, whether an excursion into federal or state law questions is entailed. Distribution of the fund should not involve prolonged litigation. It is an administrative matter involving the exercise of an informed judgment by the federal court and should have the flexibility and dispatch which characterize the administrative process." Federal Power Commission v. Interstate Natural Gas, 336 U. S. at page 584, 69 S.Ct. at page 779.

8. That the concern of the act and of the Supreme Court was for the retail consumers purchasing at resale from utilities, the opinion makes clear: "They were the intended beneficiaries of rate reductions ordered by the federal commission, though state machinery might have to be invoked to obtain lower rates at the consumer level. The rates charged a wholesaler are part of its costs, reflected in its rate base. Reduction of those costs normally will lead in due course to reduction in its resale rates, unless we are to assume that the passage of the Natural Gas Act was an exercise in futility." Federal Power Commission v. Interstate, 336 U. S. at page 581, 69 S.Ct. at page 778.

As to the industrial customers, the court makes it clear that while they may show themselves entitled to a recovery, there is a positive burden on them to do so:

"We likewise do not know whether the reductions would have reached the industrial users either by terms of the contracts or by virtue of the assertion of regulatory authority.

"If in this situation local law provides a standard for determining which of two or more claimants would have been entitled to the benefits of the rate reduction, the federal court should apply it. If clear and speedy state remedies are available, the federal court might hold the fund until those having the final say on the state law questions have spoken. * * * But in absence of such a showing the federal court in the interest of dispatch should proceed to determine the questions, relying on such sources of local law as may be available, including information from state regulatory agencies." Federal Power Commission v. Interstate, 336 U. S. at page 583–584, 69 S.Ct. at page 779.

proceedings and the rate order made by a commission, neither asserting nor having jurisdiction over prices paid or to be paid by them under the contract, they were the fruit of private and arms length negotiations [9] under the compelling pressures of other competing fuels.

Nor are the industrial claimants in any better position from an equitable standpoint, first, because the prices charged them by Mississippi having been fixed on a competitive open market basis and not on the basis of regulation, there is no ground for a finding that Mississippi has been unjustly enriched at their expense. This is so because Mississippi collected from them only what, dealing at arms length and in a market where prices are fixed by costs of competing fuels, they had voluntarily agreed to pay. It is so, too, because if this court, on the theory of unjust enrichment to Mississippi by returning to it its own money which it had paid out, were to order these moneys paid over to the Industrial customers, it would then, on the same principle, have to order them in turn to pay them over to the contract consumers of their goods, and so on, *ad infinitum*.

When we turn for the basis of the claim of the industrial customers to their contention that they are entitled to a refund by virtue of the assertion of state regulatory authority, we find them in no better position.

As to the Missouri claimants, we are not only pointed to no law supporting their claim, but also "relying on such sources of local law as may be available, including information from state regulatory agencies", we are positively advised to the contrary.

As to the Illinois industrial claimants, they do urge upon us that the law of Illinois grants the Illinois Commission statutory authority to regulate private contract purchases, and they do have the support, since Feb. 8, 1950, of the Illinois Commerce Commission, as presently composed. They are, however, confronted, as far as their claim for reparation or refund as to these particular purchasers are concerned, with the ruling and findings [10] made on Jan. 14, 1949, by the predecessors of the present commission and the undisputed fact that, with the consent and acquiescence of these purchasers, the commission,

---

9. In the opinion of Jackson, J., it is said: "The Commission does not tell us the prices paid by various classes of consumers. But it is common knowledge that, for a variety of reasons, industries get a much lower price per m. c. f. than domestic users. If we assume it is 50%, then the refund would repay industrials twice as large a proportion of what they have paid for gas per m. c. f. as it would household users. Is this 'equity'? * * * I have great doubt whether the industrial users have any just basis for participating in this refund; but if they could, and they certainly are entitled to try, their share should not be greater than their proportion of the *revenues contributed*, rather than of their proportion of the *consumption*. The latter measures only the benefits they already have derived from exhausting the Nation's supplies, not at all what they have contributed to the fund." Federal Power Commission v. Interstate, 336 U.S. at page 592–593, 69 S.Ct. at page 783.

10. "(9) That, with respect to direct sale contracts, it was the contemplation of both buyer and seller that gas thereunder should be furnished as a specially negotiated sale of a commodity and not as a public utility operation; * * *

"(14) That nearly all the industries which so purchase gas from the company have made representations to this commission in this proceeding and in every case the said industry does not seek to have the commission declare the said sales to be of a public utility character, but in effect acquiesces in continuance of the present arrangements; * * *

"(16) * * * the commission now finds that the sales of gas presently being made and which have been made for approximately 10 years in the same territory and to substantially the same customers by the company do not have the quality of a public utility operation but were originally intended bona fide to be, and still are, in the nature of private purchase and sale of gas, and do not represent a public use within the meaning of Sec. 10 of 'An act concerning public utilities', as amended."

at no time during the period of or since these purchases, has asserted any claim to regulate, or concern itself with, them.

In these circumstances, it is quite clear that we cannot find that "clear and speedy state remedies are available" to the industrial customers for the recovery of any of these funds but that the contrary is so. It is equally clear that proceeding "in the interest of dispatch, to determine the questions, relying on such sources of local law as may be available, including information from state regulatory agencies", we must determine that these contestants are not entitled under local regulatory law to the refunds they claim.

Of the opinion, therefore, that the plan as proposed and in large part agreed to is just, fair, and reasonable, and that the distribution of the funds should be made in accordance with it, the decree proposed in the petition for show cause will be entered as our decree. There will be added to it, however, at its foot, that a plan, for the distribution by the Illinois utility companies to their consumers of the $30,073.01, ordered paid to them, on the order of that suggested in the brief of the Federal Power Commission be adopted, and that the expense of making such distribution be borne by Interstate.

Swan, Circuit Judge, dissented.
See also 179 F.2d 628.