**Joel YOHALEM, Petitioner,**

v.

**WASHINGTON METROPOLITAN AREA
TRANSIT COMMISSION, Respondent,**

**D. C. Transit System, Inc., Intervenor.**

No. 22865.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 11, 1969.

Decided May 11, 1970.

Petition for Rehearing Denied
June 12, 1970.

Mr. Joel Yohalem, Washington, D. C., petitioner pro se, with whom Mr. Morton E. Yohalem, Washington, D. C., was on the brief, for petitioner.

Mr. Douglas N. Schneider, Jr., Gen. Counsel, Washington Metropolitan Area Transit Commission, for respondent.

Mr. Harvey M. Spear, New York City, for intervenor.

Before BAZELON, Chief Judge, and TAMM and MacKINNON, Circuit Judges.

TAMM, Circuit Judge:

The instant petition challenges the action of the respondent Washington Metropolitan Area Transit Commission in granting fare increases to intervenor D. C. Transit System, Inc., pursuant to an order issued December 23, 1968. For the reasons hereinafter stated, we affirm the Commission's decision and order.

## I. THE PROCEDURAL BACKGROUND

For present purposes, the convoluted procedural history of the instant controversy begins on October 8, 1968, with the issuance of this court's opinions in Williams v. WMATC, 134 U.S.App.D.C. 342, 415 F.2d 922 (*en banc*), cert. denied *sub nom.* D. C. Transit System, Inc. v. Williams, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 733 (1969) and Payne v. WMATC, 134 U.S.App.D.C. 321, 415 F. 2d 901. In *Williams* we held, *inter alia,* that the Commission had erred in granting certain fare increases in 1963 to D.C. Transit, and that a previous remand to the Commission had not cured the defects in the original order; therefore, we ordered the Commission to supervise the creation and maintenance of a "riders' fund" through which D.C. Transit would make restitution of the excess fares collected pursuant to the invalid order, to the extent that these fares had exceeded a level conceded by the protestants to be a fair rate of return. In the *Payne* decision a panel of this court concluded in general that the Commission had acted reasonably and within the scope of its authority in its 1967 grant of interim and final approval to rate increases for D.C. Transit. However, the cause was remanded to the Commission for a determination of whether the prevailing uniform fare for travel within the District of Columbia was unduly discriminatory in favor of suburban passengers, and thus violative of the applicable statutory standard. In ordering further

proceedings in *Payne*, we pointed out that "we do not view our holding in this regard as requiring that the rate increases ordered by the Commission [in 1967] be rescinded, and we leave the matter of any immediate fare adjustments to the Commission's discretion." 134 U.S. App.D.C. at 341, 415 F.2d at 921.

When these opinions issued, the Commission was in the process of concluding yet another proceeding, Docket No. 186, in which D.C. Transit was seeking fare increases. On October 18, 1968, the Commission issued Order No. 880, which summarized the results of the formal hearings in Docket No. 186. In this order, the Commission found:

> [F]or the first time in our experience, the formal parties * * * are all in substantial agreement on the revenue and expense projections. These projections show beyond question that under the present fare structure, the company will not receive sufficient revenues during the year ending July 31, 1969, to pay the operating expenses and interest charges which it will incur.

(Order No. 880, slip op. at 3–4.) The order also contained several other findings relevant to the present petition. The Commission noted that "the basic reason for this present rise in the fares is the increase in the cost of operating the bus system," and that this upward trend in costs was primarily attributable to increased labor expenses. (*Id.* at 4–5.) In addition, some doubts were expressed concerning the usefulness as a predictive tool of the available data on the company's recent financial history. This uncertainty was created by a number of events which had had an adverse impact on D.C. Transit's ridership levels: the April, 1968 civil disorders, the Poor People's Campaign, and work stoppages due to the robbery of D.C. Transit drivers. These events, the Commission concluded, had been a material factor contributing to the company's loss of nearly $900,000 during the first seven months of calendar year 1968. (*Id.* at 7). However, the Commission assumed that these difficulties were only temporary, and adjusted the historical revenue and expense figures to eliminate the impact of these unusual occurrences. (*Id.* at 7–8.) Finally, turning to the problems posed by the recent *Williams* remand, the Commission concluded that "the wisest use of the riders' fund is to eliminate return to the equity holders until such time as full restitution is made of the amounts which the court has held were improperly obtained from the riding public." (*Id.* at 41). Therefore, the Commission ordered that the record in Docket No. 186 be reopened to receive additional evidence on the question of what changes should be made in the existing fare structure in order to bring the company to the break-even point, and further suspended D.C. Transit's proposed tariff's until November 4, 1968.

On October 29, 1968, the Commission issued Order No. 882 which authorized, among other things, an interim increase to a basic fare of 30 cents cash or four tokens for $1.05. These fares were designed to bring the company's revenues to the break-even point for a temporary period until the issues presented by the *Williams* remand had been clarified; the order also had the effect of further suspending the tariffs filed by D.C. Transit until December 13, 1968, which was the last day of the suspension period permitted by the Washington Metropolitan Area Transit Regulation Compact.[1] On December 13, with the suspension period expiring, the Commission issued Order No. 894, terminating the proceedings in Docket No. 186. In this order, the Commission noted that D.C. Transit had filed a petition for certiorari in the Supreme Court, seeking review of this court's decision in *Williams*; this action operated to stay our mandate in *Williams* pending disposition of the petition, and left the riders' fund issue in doubt. Nonetheless, the Commission elected to continue its

---

1. *See* 74 Stat. 1027, 1040 (1960); Order No. 894, at 2.

policy of requiring the company to operate at the break-even point:

> It may be argued that until a definite riders' fund is established the company should be entitled to earn a return for the stockholders, and if a riders' fund does develop, adjustments can be made on the company's books accordingly. It cannot be denied, however, that while those monies may be subject to refund, the rider of today is not necessarily the rider of tomorrow. This is particularly true in view of the transient nature of the population of the Washington Metropolitan area. It is therefore our duty to look at the background of all these consequences and, where a choice must be made between the ratepayer and the stockholder, find for the ratepayer.

(Order No. 894, at 4.) Thus, the Commission determined to keep in effect the basic fare structure approved in Order No. 882; at the same time, it noted that "certain vexing and difficult problems have come to our attention during the interim period between Order No. 882 and this order." (*Id.*) These problems related to the deteriorating ridership levels experienced by the company during the five weeks in which the interim fares had been in effect: preliminary data indicated that D.C. Transit's farebox revenues during this period had fallen approximately $40,000 per week below the amount calculated to maintain the company at the break-even point. (*Id.* at 5–6.) The Commission, "faced \* \* \* with the serious prospect that the fare adjustments made in Order No. 882 [had]. not made it possible for the company even to meet its operating expenses and interest cost" (*Id.* at 6), and confronted with the expiration of the statutory suspension period, found itself in a dilemma. As a possible method of satisfying its conflicting responsibilities, the Commission decided:

> [T]he wisest course is to conclude this proceeding with a final order approving the existing fare structure as being just, reasonable and non-discriminatory *on the basis of this record.*

Simultaneously, we will exercise our power pursuant to § 6(b) of the Compact to institute a further investigation of D.C. Transit's rates. We will use as our starting point in that investigation the facts developed in this record concerning the operating revenue deductions and interest expense which the company will experience in the future annual period. The first principal subject of inquiry will be the fare adjustments, if any, required to produce farebox revenues sufficient to cover the aforesaid operating revenue deductions and interest expense.

(*Id.* at 7–8; emphasis added.) On the same day, the Commission issued Order No. 895, which provided for the investigation described above, set January 14, 1969, as the date on which a public hearing would be held, required D.C. Transit to give public notice of the hearing by December 20, and declared that official notice would be taken of the testimony and exhibits introduced in Docket No. 186.

The next significant development in the controversy occurred on December 16, 1968. On that day, D.C. Transit filed with the Commission a motion requesting that the hearing scheduled for January 14 be held immediately, and that an interim order be entered increasing the company's fares. In support of this request, the company alleged that it was unable to meet its current operating expenses, so that its ability to continue operations was in jeopardy, and that it had outstanding debts in excess of $27 million, a substantial portion of which would be subject to call and immediate payment in the event that the company failed to meet its obligations as they fell due. On the same day, the Commission responded to this request by issuing Order No. 896, stating:

> [T]he Commission is of the opinion that it must act promptly and expeditiously to determine the legitimacy of Transit's claim. If the company is in fact unable to meet its payroll and other current operating expenses, then this community will be faced with the

possibility of a cessation of operations. This is an eventuality we cannot countenance if it is within our power to take action to preclude it.

We are, therefore, setting this matter for hearing on Thursday, December 19, 1968, at 9:00 a. m.

The Commission also ordered its chief clerk to serve a copy of the order on all formal parties to the proceedings in Docket No. 186, by special delivery mail. Most of the parties to the former proceeding appeared at and participated in the December 19 hearings.

On December 23, 1968, the Commission issued Order No. 900, the decision presently under attack. In this order the Commission, acting on the assumption that the downward trend in ridership would level off rather than continue to worsen, found that D.C. Transit's "cash working capital is fast disappearing" and that "its ability to obtain further credit is seriously in doubt" with fares at the prevailing level. (Order No. 900 at 5.) "In these circumstances," the Commission concluded, "we have a clear obligation to take immediate action to ensure the company's continued ability to provide the transit service so vitally needed by the community"; accordingly, a rate increase was granted, raising the company's fares to thirty cents for all routes within the District of Columbia and five cents above the prevailing fares for all suburban zones. (*Id.* at 6–8.)

Subsequently, on January 10, 1969, the Commission entered Order No. 903, which canceled the hearing originally set for January 14. On January 22, the petitioner in the present action filed with the Commission an application for reconsideration of Order No. 900; this motion was dismissed by the Commission as untimely filed, but on appeal this court reversed the dismissal and directed the Commission to consider the issues on their merits. Yohalem v. WMATC, 134 U.S.App.D.C. 77, 412 F.2d 1124 (1969). Thereafter the Commission considered the application for reconsideration on the merits and denied it (Order No. 963, July 14, 1969); the present petition for review followed. For convenient reference, a table of the various relevant orders is set forth in the margin.[2]

2. 

| Order | Date | Subject Matter |
|---|---|---|
| DOCKET No. 186 | | |
| No. 880 | Oct. 18, 1968 | Found that company's projected revenues would not meet projected expenses; determined that company would be required to operate at break-even point; reopened record for additional evidence. |
| No. 882 | Oct. 29, 1968 | Granted interim fare increase; extended tariff suspension until December 13. |
| No. 894 | Dec. 13, 1968 | Terminated Docket No. 186; found existing fares just and reasonable on the basis of the record; noted necessity of further proceedings. |
| DOCKET No. 194 | | |
| No. 895 | Dec. 13, 1968 | Initiated investigation of company's rates; set hearing for January 14, 1969. |
| No. 896 | Dec. 16, 1968 | Rescheduled hearing for December 19; provided for notice of hearing. |
| No. 900 | Dec. 23, 1968 | Granted the company a fare increase. |
| No. 903 | Jan. 10, 1969 | Canceled hearing originally scheduled for January 14. |
| No. 963 | July 14, 1969 | Denied Petitioner's application for reconsideration of Order No. 900. |

## II. THE PROPRIETY OF PROCEEDING UNDER SECTION 6(b) OF THE COMPACT

■ Petitioner first contends "that the Commission erred in raising fares in a proceeding instituted under Section 6(b)" of Article XII of the Compact. The operative language of section 6(b) grants the Commission broad power to take the initiative in adjusting rates:

> Whenever, upon complaint, or upon its own initiative, and after hearing held upon reasonable notice, the Commission finds that any * * * fare in effect for transportation subject to this Act * * * is unjust, unreasonable or unduly preferential or unduly discriminatory, the Commission shall issue an order prescribing the lawful fare * * *

(74 Stat. at 1041.) The explanation of this language which is provided in the legislative history is terse and summary, and offers little guidance in resolving the present controversy. *See* S.Rep.No.1906, 86th Cong., 2d Sess. 13–14 (1960); H.R. Rep.No.1621, 86th Cong., 2d Sess. 12 (1960). However, petitioner relies upon FPC v. Sierra Pacific Power Co., 350 U.S. 348, 355, 76 S.Ct. 368, 372, 100 L.Ed. 388 (1956)—which is admittedly distinguishable on its facts—for the proposition that "the purpose of the power given the Commission by [a similar section of the Federal Power Act] is the protection of the public interest, as distinguished from the private interests of the utilities." Therefore, he concludes, the Commission's actions under section 6(b) must be tested by the public interest standard, and, when the order presently in issue is measured against that standard, it must be held improper.

We agree that the Commission's primary *raison d'etre* is furtherance of the public interest, and that this notion is in some measure implicit in the standards "unjust, unreasonable or unduly discriminatory" contained in section 6(b). However, we cannot agree with the specific content which the petitioner seeks to give the public interest test in its application to the present factual situation. First, we can find no support in the language or legislative history of the Compact for petitioner's contention that section 6(b) does not give the Commission power to raise fares in situations where the company could seek a rate increase under section 5(e) of Article XII by filing new tariffs. Even if this argument for an implied exception to section 6(b) were persuasive, however, we think that on the facts of this case it would be an exaltation of form over substance to attribute decisional significance to the company's failure to file new tariffs after entry of Order No. 894. It is clear that expiration of the tariff suspension period in Docket No. 186 came at a time when there were major questions still unresolved, and when the company was threatened with serious financial difficulties. Further proceedings were essential to enlightened resolution of D.C. Transit's many problems and to proper implementation of this court's mandate in *Williams*. In this situation, it would be unduly formalistic to say that the Commission had to wait for the company to file new tariffs before it could continue its investigation.

■ Although the procedures which the Commission used to initiate the investigation leading to Order No. 900 were proper, the question remains whether the Commission erred in finding that D.C. Transit's fares were "unjust and unreasonable" within the meaning of section 6(b). (Order No. 900 at 5.) We conclude that this determination was in accord with the concepts of public interest implicit in section 6(b), and supported by substantial evidence. As the facts detailed in part I of this opinion make clear, the Commission's primary concern throughout this complicated series of proceedings was to keep the buses running, while at the same time maintaining the company at the break-even point in order to comply with the spirit of this court's decision in *Williams*. In Order No. 900, the Commission detailed the reasons for its concern that service would be

interrupted if fares were maintained at the prevailing levels:

> [The Vice-President and Comptroller of D.C. Transit] presented statements of financial condition which showed a steady decline in retained earnings due to operating losses, a steadily worsening ratio of current liabilities to current assets, an income statement for November, 1968, which showed that even under the increased fares authorized by Order No. 882 the company had lost $227,768 in that month alone, and an analysis of cash flow which indicated that a serious cash deficit, amounting to over $600,000 would exist by January 15, 1969. No question as to these facts was raised by any party. [He] stated that D.C. Transit's credit was seriously impaired and that a number of suppliers were now requiring a C.O.D. arrangement.
>
> \* \* \* \* \* \*
>
> \* \* \* The evidence of record makes it plain beyond dispute that this company is not presently obtaining revenues sufficient to cover its expenses. \* \* \* In these circumstances we have a clear obligation to take immediate action to ensure the company's continued ability to provide the transit service so vitally needed by the community.

(*Id.* at 3, 5–6.) In light of these findings and conclusions, we cannot say that the Commission was oblivious to the public interest in Order No. 900, or that its findings in this regard were so lacking in support as to require reversal.

## III. ADEQUACY OF NOTICE REGARDING THE DECEMBER 19 HEARING

Petitioner's second attack on Order No. 900 is based upon the adequacy of the notice given prior to the December 19 hearing. In support of this contention, petitioner emphasizes the brief span of only three days between issuance of Order No. 896 and the hearing; in addition, he points out that Order No. 896 did not require D.C. Transit to undertake newspaper publication or bus-window posting of notice, as is normally done. Finally, petitioner asserts that the Commission could not reasonably claim that rescheduling of the hearing was justified by emergency conditions, in view of the possibility that measures less drastic than a fare increase, such as a cutback in service on some routes, could have served to avoid the risk of a total bus stoppage. This latter argument relates more closely to the issue treated in the following section: whether the Commission adequately considered all of the possible alternatives and relevant factors in making its substantive decision to grant D.C. Transit a fare increase. Therefore, this contention will be examined in regard to the notice problem only to the extent of determining whether the Commission acted upon a reasonable basis in expediting the hearing on such short notice.

The only standard for adequacy of notice contained in section 6(b) is the requirement that the notice be reasonable; therefore, our present inquiry is primarily an evaluation of the existing facts and circumstances as they appeared to the Commission at the time Order No. 896 was issued, and not as they might now appear with the benefit of hindsight. In this order, the Commission first reiterated D.C. Transit's allegations in its motion for immediate hearing to the effect that it would not be able to continue operation even to mid-January at the prevailing rates, and then stated:

> [T]he Commission is of the opinion that it must act promptly and expeditiously to determine the legitimacy of Transit's claim. If the company is in fact unable to meet its payroll and other current operating expenses, then this community will be faced with the possibility of a cessation of operations. This is an eventuality we cannot countenance if it is within our power to take action to preclude it.

(Order No. 896, at 2.) It must be remembered that the Commission's decision to reschedule the hearing was not based solely on a mere unsupported alle-

gation by D.C. Transit; indications that the company was threatened with serious financial difficulty had been noted in the proceedings in Docket No. 186. We think that the data available to the Commission at the time Order No. 896 was issued supported its conclusion that delay until the scheduled hearing date of January 14 would have created an unacceptable risk that mass transit within the District of Columbia would come to a halt at one of the busiest times of the year. The short notice period necessitated by this abbreviated schedule was not so unreasonable as to constitute reversible error.

■ Given this need to act quickly, we think that the Commission also acted reasonably in attempting to inform potential participants of the expedited hearing. As noted above, Order No. 896 provided that special delivery notice would be served upon all formal parties to the related proceedings in Docket No. 186; in addition, the Commission has made the uncontroverted assertion in its brief that it made efforts to inform the local news media of its action in rescheduling the hearing, and that the media devoted substantial coverage to this fact. It seems likely that these methods constituted the best possible notice under the circumstances; at least, we do not believe that any adverse inferences should be drawn from the Commission's failure to resort to the more customary but more cumbersome procedures of bus-window posting and publication by paid newspaper advertisement.

■ Petitioner characterizes as circular the Commission's reasoning that the short notice period was not a serious handicap to those who wished to participate in the hearing because the sole question being considered was whether revisions should be made in D.C. Transit's estimated ridership levels for the future annual period. In essence, petitioner contends that the initial determination to limit the scope of the proceedings was improper, and that the brevity of the notice period acted to foreclose other

parties from presenting alternatives less drastic than a fare increase, such as cutbacks in service for unprofitable routes. We cannot agree. As we stated above, the Commission reasonably concluded that D.C. Transit was confronted with a financial emergency; thus, an expeditious means of averting this threat was needed. The Commission, at the time Order No. 896 was issued, had accumulated a substantial data base for passing upon a fare increase because of the evidence taken in Docket No. 186; proceedings which encompassed the possibility of abandoning or curtailing service on selected routes surely would have taken much longer, because the Commission would have been starting with a blank slate. Thus, we think that the decision to act upon the threatened emergency within the limited context of possible rate adjustments was within the ambit of the Commission's discretion, and that the notice provided in Order No. 896, although brief, comported with the standard of reasonableness contained in section 6(b) of the Compact.

## IV. SUBSTANTIVE OBJECTIONS TO ORDER NO. 900

Petitioner's most substantial assaults upon Order No. 900 are based upon the general theory that the Commission's findings and conclusions are deficient because it failed to examine or obtain necessary data, or to consider possible alternative remedies. Specifically, petitioner contends that the Commission committed reversible error by failing to investigate the possibility that variable costs would decline as a result of the decline in ridership; in addition, he asserts that the Commission should have explored alternatives such as cutting back service or requiring amortization of the riders' fund before granting a fare increase. We shall consider each of these arguments separately.

### A. Treatment of Variable Costs

■ Petitioner asserts that the Commission acted upon an erroneous premise in assuming that D.C. Transit's costs

would remain constant in spite of the ridership decline. In support of this allegation, he relies upon the Commission's previous discussion of the relationship between costs and ridership levels in the Docket No. 186 proceedings. There the Commission, in responding to the argument that reduced fares would increase ridership and thus permit the company to earn a fair return at less cost to the riding public, pointed out that a twenty-cent fare would require nearly fifty per cent more riders to generate the same amount of revenue produced by a thirty-cent fare. (Order No. 880, slip op. at 15.) The Commission went on to observe that the requisite 44 per cent increase in ridership would also increase costs; for purposes of discussion, the Commission assumed that costs would rise by 22 per cent, but it noted that "[t]his is truly a conservative estimate since a substantial portion of any overall increase in ridership of this magnitude would inevitably occur during the period of peak demand, when the incremental cost of adding new riders is very high." (*Id.* at 15 n. 23.) Other computational difficulties were described:

> To meet these expenses, an additional 41,785,885 riders at 20¢ each would be required. This is an additional 28% increase in ridership that would be necessary. An increase of this magnitude would also lead to increased expenses and the cycle would have to be repeated again. According to our computations, the company would not meet its expenses and earn a fair return at

a 20¢ fare unless it had a total of 191,110,885 D.C. riders paying that fare. This would require an increase of 85% over existing ridership levels! There is not the slightest shred of support for thinking that such price elasticity exists.[3]

Petitioner contends that this discussion indicates the existence of some direct variation between costs and ridership levels, so that the Commission erred in Order No. 900 by assuming that the cost estimates used in the Docket No. 186 proceedings were still valid.

Putting aside the question of what precedential significance should be accorded the discussion of price elasticity in Order 880, and assuming arguendo that a substantial portion of the company's costs were variable, we think that petitioner's argument somewhat over-simplifies the cost problem. As a general matter, it seems clear that variable costs are linked to ridership only insofar as changes in the level of patronage make increases or decreases in the level of service desirable; at least, it is difficult to see how the company will save money if it is running the same schedules over the same routes, but with fewer total passengers than normal. Therefore, the real question is whether the Commission, in the context of the present proceedings, was required to investigate the possibility that declining ridership justified reductions in service and concomitant reevaluation of cost figures.

---

3. Order No. 880 at 15–16 (emphasis removed). There is some indication in the record of Docket No. 186 that similar computational difficulties are inherent in the assessment of downward trends in ridership; *see e. g.,* Chairman Avery's remarks at Tr. 734–35:

> Now, you have a spiral going on . * * * in the railroad industry, and that spiral was accelerated by the fact that you would have an increase in cost, you would increase the fares, that would drive away riders, therefore [the company] would cut back service, and that cutback in service would drive

away even more riders * * * [because] if you have ten minute service on the X Line * * * and you lose riders and you say, "All right, we are carrying fewer riders and now we are going to cut back to 12 minutes service, or 15 minutes service," * * * [then] you get people saying [they] wait too long for a bus so [they are] going to arrange other forms of transportation, and you lose even more and then you end up accelerating the spiral. * * * [Y]our cost reduction doesn't keep up with the revenue reduction. * * *

## B. *The Need to Consider Possible Reductions in Service*

At the outset, it is clear that the Commission did not give extended consideration to the possibility that the demonstrated ridership losses made reductions in service feasible or desirable. Indeed, one of the few allusions to this problem in the record reveals the Commission's threshold determination that the quality of service offered the public would be maintained despite the drop in farebox revenues. At the conclusion of the proceedings in Docket No. 186, the Commission noted:

> Since the murder of a D.C. Transit driver in April, 1968, the company has experienced a reduction in the number of drivers on its working force. This has produced an undesirable deterioration in service, and the Commission has directed the company to step up its recruitment activity with a view toward attaining a full complement of drivers no later than January 31, 1969.

(Order No. 894 at 6 n. 1.) This is virtually the only consideration contained in the record of the question whether cost savings through service cutbacks were possible, until the Commission ruled upon petitioner's application for reconsideration of Order No. 900; then it articulated its assumption that the ridership decline was not sufficiently concentrated in time or place to permit selected service reductions. (Order No. 963 at 7.) If the Commission was required to assess possible cost and service reductions, this summary analysis plainly cannot withstand judicial scrutiny. *Cf.* Payne v. WMATC, 134 U.S.App.D.C. 321, 338–342, 415 F.2d 901, 918–922 (1968). However, we believe that in the peculiar circumstances of this controversy the Commission had good cause for abstaining from the kind of inquiry urged by petitioner.

As noted in the preceding section, an inquiry into the relationships among costs ridership levels, and service cutbacks raises a host of complicated factual questions (*see* note 3 *supra* and accompanying text); the Commission would have had to make this investigation *de novo,* since the factual situation as to ridership levels had changed significantly since the early proceedings in Docket No. 186. At the same time, the Commission clearly had sufficient reason to conclude that time was of the essence in the proceedings underlying Order No. 900, and that the status quo placed D.C. Transit in an intolerable financial position. We cannot say that the Commission was required to undertake an inquiry into possible service reductions before it could order these fare increases; it would be a strange interpretation of the public interest which encompassed the likelihood that the Commission would be holding hearings on the issue of whether some routes had become sufficiently unprofitable to warrant cutbacks in service, while creditors forced the company into a total shutdown.

From a broader perspective, the problem touches upon the Commission's need to allocate priorities among numerous and occasionally conflicting duties in the face of limited time and resources. During the time period presently in issue, the Commission was confronted with several extremely complex legal and factual problems regarding D.C. Transit alone, in addition to its other regulatory duties. One of these major undertakings concerned the cost allocation study ordered in *Payne,* which was discussed by the Commission in Order No. 900. The problem arose because the company and the Commission staff had urged that a change in the suburban zone structure was a desirable method of procuring the needed revenues. The Commission rejected these changes as premature:

> [W]e are just undertaking a cost allocation study in accordance with the recent directive of the court of appeals. We are sure that the results of that study will be useful in forming a judgment as to appropriate changes not only in suburban zone fare levels but in the structure of the zones themselves. We believe it is unwise at this juncture to undertake [a] radical re-

structuring of the zones. * * * To reduce the number of zones * * at this point would cause serious disruptions to the zone pattern. We might wish to make further changes in that pattern when the cost allocation study is complete. Two such changes in a short period could lead to considerable confusion and misunderstanding on the part of the riding public.

(Order No. 900 at 6.) Similarly, it appears that considerations of administrative efficiency required that the questions concerning possible service reductions be resolved in a context more conducive to unhurried and informed deliberation than the crisis atmosphere which prevailed in the instant proceedings. This conclusion is consistent with our rationale for affirming the fare increases in *Payne,* in spite of our determination that the Commission had not dealt adequately with the question of alleged discrimination: "[T]he Commission, balancing the possibility of unfairness to particular customers or classes of customers against the company's immediate need for increased revenues, might have deferred consideration of the questions relating to discrimination while granting Transit's request for a fare increase. And we hold that it is within the Commission's discretion to follow that course on remand." (134 U.S.App.D.C. at 342, 415 F.2d at 922.)

### C. *Amortization of the Riders' Fund*

■■ What we have said in the foregoing sections is in large measure dispositive of the contention that the Commission was required to amortize the riders' fund ordered in *Williams* before it could grant a fare increase. For present purposes, it is sufficient to observe that this issue was hedged with uncertainty because of the pendency of the petition for certiorari in *Williams,* and that the course of action urged by petitioner might well have resulted either in the

transit stoppage which the Commission was seeking to avoid, or in another series of complex legal problems. The company's difficulties were essentially cash flow problems; without new infusions of cash, it was in serious danger of becoming unable to satisfy its creditors. Requiring "amortization" of past overpayments computed under the *Williams* opinion would have done nothing to alleviate this situation. Petitioner suggests that the Commission might have required the company to liquidate certain of its assets which were not used in connection with its transit operations. This surely would have raised serious statutory and constitutional questions which would have entailed protracted litigation, and we do not believe that either the Compact or the *Williams* opinion required this result. "In a statutory scheme in which Congress has given an agency various bases of jurisdiction and various tools with which to protect the public interest, the agency is entitled to some leeway in choosing which jurisdictional base and which regulatory tools will be most effective in advancing the Congressional objective." Philadelphia Television Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966).

Thus, in light of the serious threat of emergency which existed during the course of the instant proceedings, we conclude that the Commission's action in Order No. 900 was reasonable and in accord with governing principles of law. We therefore affirm.

Affirmed.

BAZELON, Chief Judge (dissenting):

I would reverse Order No. 900 for at least two of the reasons advanced by Petitioner.[1]

### I.

These proceedings were initiated by the Washington Metropolitan Area

---

1. It is therefore not necessary for me to consider Petitioner's two additional contentions: (1) that the notice and hearing for Order No. 900 were inadequate, and (2) that the Commission should have amortized the "riders' fund" created under Williams v. WMATC, 134 U.S.App.D.C. 342, 415 F.2d 922 (1968), before imposing a fare increase on the public.

Transit Commission under Section 6(b) of its enabling Compact.[2] There is serious question, however, whether the Commission may institute a proceeding for the purpose of raising tariff rates. Section 6(b) allows the Commission "upon complaint, or upon its own initiative," to adjust fares in order to protect the public against an "unjust, unreasonable or unduly discriminatory" tariff. Section 5 of the Compact allows the carrier to seek rate increases to preserve its financial integrity.[3]

In F.P.C. v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), the Power Commission had instituted proceedings under provisions similar to § 6(b) on the theory that the low rate of return being allowed "might impair the financial ability of the public utility to continue its service." 350 U.S. at 355, 76 S.Ct. at 372. The Supreme Court held that "the purpose of the power given the Commission by [this section] is the protection of the public interest, as distinguished from the private interests of the utilities." [4] Accordingly, the record in a § 6(b) proceeding must satisfy this "public interest" test.

Order No. 895, which instituted the present proceedings, merely directs that "an investigation be made of the fares of D.C. Transit System, Inc., to determine whether the existing fares are unjust and unreasonable, and, if so, what fares should be prescribed." Clearly, the order invoked the language of Section 6(b) as the basis for the proceedings;

yet equally clearly, it does nothing to explicate what "the public interest" in the proceedings might be.

Likewise Order No. 894, incorporated by reference into No. 895, contains no finding on this point. Referring to the "interim rates" established by Order No. 882,[5] it concluded

> The evidence of record, not objected to or supplemented in pertinent part by the company, provides an adequate basis for a conclusion that we have made sufficient adjustments for the company's financial health.[6]

The subsequent assertion that there is a "very real prospect that the company would be unable to provide service at all" was based on allegations "not yet produced in a formal record."

The "public interest" criterion is similarly inchoate in Order No. 900 which is on appeal here.[7] The conclusion on which the fare increase turns is simply:

> Hence, the existing fare structure is unjust and unreasonable in that it will not produce sufficient revenues to enable the company to cover its operating expenses and interest cost.[8]

In deciding to institute the fare increases immediately, however, the Commission did avert to the company's "deteriorating" financial state. The Commission recited its "clear obligation to take immediate action to ensure the company's continued ability to provide the transit service so vitally needed by the community." [9] Yet more is needed than

---

2. Compact, Art. XII, § 6(b), incorporated into Pub.L. 86–794, 74 Stat. 1031 (1960), and set forth following D.C.Code § 1–1410 (1967).

3. And Section 5 has not gone unused. We have previously concluded that the provision has been employed to allow "Transit to earn extraordinarily high returns on its investment." *Williams, supra* note 1, 134 U.S.App.D.C. at 356, 415 F.2d at 936. *Cf.* F.P.C. v. Interstate Gas Co., 336 U.S. 577, 582, 69 S.Ct. 775, 93 L.Ed. 895 (1949).

4. 350 U.S. at 355, 76 S.Ct. at 372. A regulated rate, as Mr. Justice Harlan wrote for the *Sierra* Court, "may not be said to be either 'unjust' or 'unreasonable' simply

because it is unprofitable to the public utility." *Id.*

5. Order No. 882 was designed to increase D. C. Transit's annual revenues $1,700,000 by raising cash fares from 27¢ to 30¢ and the price of four tokens from $1.00 to $1.05 (Sept. 29, 1968).

6. Order No. 894 at 7.

7. Order No. 900 was designed to increase D. C. Transit's annual revenues $2,250,000. Petitioner objects only to the portion of the Order which increased the price of four tokens from $1.05 to $1.20, accounting for a projected revenue increase of $1,900,000 (Dec. 23, 1968).

8. Order No. 900 at 5.

9. *Id.* at 6.

a conclusory statement. "Without any evidence on this essential issue, there is no basis for application of any standard and the judicial review authorized by the statute becomes a formal but futile gesture." [10]

The Commission's authority to issue an order under § 6(b) depends on the demonstration of a necessary connection between the new rates it promulgates and "the public interest." Failure to subject this issue to inquiry at the hearing and the consequent inadequacy of the record and the findings render the Commission's conclusion * * * wholly ineffective for its purpose." [11] Moreover, the orders not only fail to locate the nexus between increased rates and "the public interest," but they also fail to explore whether there were any alternatives to an immediate fare increase which would have better protected the riding public. [12]

## II.

The most serious objection to the order on review is that the Commission did not consider the effect which a decline in the number of riders would have on the company's expenses, and hence on its need for additional revenue. This failure to take account of variable costs cannot be squared with the fundamental rule that this court gives weight only to reasoned Commission findings supported by "substantial evidence" in the record. [13]

The emergency that the Commission believed it faced [14] did not excuse the absence of, at least, some brief explanation of the considerations to be weighed regarding variable costs. Yet "at no time in this proceeding has the Commission made the investigations and the resolutions essential to a legitimate exercise of its authority to prescribe just and reasonable fares." [15] Not only did the Commission fail to examine the possible decrease in expenses which would follow from a decline in ridership, but the question was explicitly excluded from the proceedings and witnesses were not permitted to testify on this point.

This refusal to consider a potential reduction in expenses brought about by a decreased number of patrons flies in the face of the Commission's previous reliance on variable cost theory. In Docket No. 186, riders' representatives contended that Transit could meet its financial requirements by reducing its fare so as to increase its patronage. In Order No. 880, the Commission rejected this argument because it found that Transit's expenses vary with ridership, especially if the change in demand affects "the period of peak demand,

---

10. Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 121, 188 F.2d 11, 17, cert. denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951).

11. *Id.*

12. Plainly, the substantive aspects of the Commission's action under review go far beyond the question of "an exaltation of form over substance." Majority opinion, *supra* at 9. In any event, an agency must adhere to the procedures established by Congress and is without authority "to replace the statutory scheme with a * * * procedure of its own invention." NLRB v. Wyman-Gordon Co., 394 U.S. 759, 764, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709 (1969) (per Fortas, J.).

13. Compact, Art. XII, § 17. *See* Williams, *supra* note 1, 134 U.S.App.D.C. at 362–363, 415 F.2d at 942–943; *Baker, supra*

note 10, 88 U.S.App.D.C. at 119, 188 F.2d at 15, and cases cited.

14. The basis for this belief is not apparent from the record. For example, at the time the Commission issued Order No. 896 (accelerating the hearing date on an "emergency" basis), the carrier's records showed that (1) in the week of November 23, 1968, it had experienced an *increase* in ridership of 20.8% over the corresponding week of the previous year, which more than offset the declines of 12.2% and 1.8% for the weeks of November 30 and December 7, respectively; and (2) the carrier had not been late by so much as a day in meeting its payroll since the October 19, 1968, pay period.

15. *Williams, supra* note 1, 134 U.S.App. D.C. at 359, 415 F.2d at 939.

when the incremental cost of adding new riders is very high."[16] Here we are not advised why the Commission anticipated a decline in ridership without a decline in costs.[17]

As the expert testimony made clear, the question of cost reduction is a complicated one, the answer to which turns on both the actual causes lying behind a gross decline in ridership and the economic models employed by the factfinder.[18] Briefly put, the question becomes "Is the decline in ridership concentrated?" The Commission simply assumed that the variable costs would not be diminished because the ridership loss would not be concentrated. "Commission expertise alone cannot support so pivotal an assumption."[19]

Moreover, the testimony most directly on point is contrary to the Commission's conclusion. It suggests that the increase in fares *would* cause a "concentrated" decline in patronage among rush-hour commuters, some of whom turn to car pools or other means of transportation when the bus fare reaches a certain level.[20] The loss of their patronage does not force Transit to discontinue certain routes, but merely relieves the pressure to run extra buses on heavily-trafficked routes during rush-hour, which is a high cost operation.[21]

"The Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding." S.E.C. v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). Since such a finding, and a record to support it, are absent here, I would vacate the order and remit the cause to the Commission for a determination of the proper use of excess funds collected.[22]

16. Order No. 880 at 15. It is misleading to characterize this order as a "discussion of price elasticity," *supra* at 16. The Commission *discussed* variable costs based on a *supposition* about price elasticity. The Commission is not bound by the exact figures used in its previous findings (or suppositions) on the extent to which D.C. Transit's costs vary with changes in ridership, but these findings do create, at the least, the rebuttable presumption that a decrease in ridership would lead to *some* reduction in operating expenses.

17. *See* Marine Space Enclosures, Inc. v. F.M.C., 137 U.S.App.D.C. 9, 17, 420 F.2d 577, 585 (1969): "the confidence of a reviewing court that these adjustments [in past policies and announcements] are made in accordance with the requirements of law is not enhanced when the prior precedents are not discussed, the swerves and reversal are not identified, and the entire matter is brushed off once over lightly."

18. Testimony of Philip D. Paterson, Jr., WMATC Docket No. 186, transcript at 729–48, August 28, 1968.

19. *Baker, supra* note 10, 88 U.S.App.D.C. at 120–121, 188 F.2d at 16–17. Similarly, the majority merely asserts, without support in the record, that "the real question" of cost reduction involves only whether declining ridership justified Transit's abandonment of certain services.

Although D. C. Transit claimed that its financial collapse was imminent, it did not file requests with the Commission to abandon any, or all, of its services, as required by law. Compact, Art. XII, § 4(i). D. C. Transit also did not appeal from any of the orders entered in Docket No. 186. For example, the Commission issued Order No. 894 on December 13, 1968, concluding that it had granted "sufficient" fare increases. Three days later, D. C. Transit alleged that these rates left it in a "precarious" financial condition, yet it never sought review of Order No. 894.

20. Testimony of D. C. Transit Vice-President J. Godfrey Butler, WMATC Docket No. 186, transcript at 432, August 27, 1968.

21. Subsequent data lend support to Petitioner's variable cost point. Order No. 984, issued October 24, 1969, reveals that Transit's operating expenses were actually $1,800,000 *below* the figure projected in Order No. 900.

22. The Commission's subsequent orders further increasing D. C. Transit's rates render a remand of this cause for a redetermination of the rate under Order No. 900 "futile." *Williams, supra* note 1, 134 U.S.App.D.C. at 360–362, 415 F.2d at 940–942.