In the Matter of the COLUMBIA GAS SYSTEM, INC., and Columbia Gas Transmission Corporation, Debtors.

**Bankruptcy Nos. 91–803, 91–804.**

United States Bankruptcy Court,
D. Delaware.

Feb. 13, 1992.

James L. Patton, Jr., Wilmington, Del., Cravath, Swaine & Moore, Stroock & Stroock & Lavan, New York City, for debtors.

Kevin Gross, Wilmington, Del., Larry J. Nyhan, James F. Bendernagel, Washington, D.C., for official committee of unsecured creditors.

Roger M. Whelan, Leslie A. Nicholson, Jr., Thomas J. Catliota, Mark H. Berman, Washington, D.C., Francis J. Trzuskowski, Wilmington, Del., for official committee of customers.

John J. Dilenschneider, Frank C. Dunbar, III, Columbus, Ohio, Stephen W. Spence, Wilmington, Del., for Columbia Gas Distribution Companies.

Eduard F. von Wettberg, III, Joanne B. Wills, John D. Demmy, Wilmington, Del., for ANR Production Co., Wyoming Interstate Co., Ltd., Colorado Interstate Gas Co., CNG Producing Co., New Bremen Corp., New Ulm Gas, Ltd., Total Minatome Corp., and Mobil Natural Gas, Inc.

Kevin G. Healy, Newark, Del., for Maryland Office of People's Counsel, Pa. Public Utility Comm., and Md. Public Service Comm.

Linda C. Smith, Alan Kohler, Pa. Public Utility Com'n, Harrisburg, Pa., for Pa. Public Utility Com'n.

John M. Glynn, Paula M. Carmody, Baltimore, Md., for Md. Office of People's Counsel.

Bryan G. Moorhouse, Susan S. Miller, Baltimore, Md., for Md. Public Service Com'n.

H. Rey Stroube, III, S. Margie Venus, Houston, Tex., Daniel F. Lindley, Wilmington, Del., for Energy Development Corp.

Laurie Selber Silverstein, Wilmington, Del., for Meridian Oil Production, Inc.

Stephen C. Stapleton, Russell L. Munsch, Dallas, Tex., William P. Bowden, Wilmington, Del., for Ozark Gas Transmission System and Ozark Financing Corp.

Kevin J. Burke, Marc J. Korpus, New York City, for West Ohio Gas Co., Peoples Natural Gas Co. and Virginia Natural Gas, Inc.

Jeoffrey L. Burtch, Wilmington, Del., Ralph R. Mabey, Raymond N. Shibley, Peter A. Ivanick, New York City, for Official Committee of Equity Security Holders.

Lawrence C. Ashby, James McC. Geddes, William P. Bowden, Wilmington, Del., for West Ohio Gas Co., Peoples Natural Gas Co. and Virginia Natural Gas, Inc.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

On August 23, 1991 the Columbia Gas Transmission Company (TCo), a debtor-in-possession, moved this court for an omnibus order authorizing it to comply with its Federal Energy Regulatory Commission Gas Tariff and orders and regulations of the Federal Energy Regulatory Commission. Three related aspects dealt with payment of FERC-ordered refunds to TCo's customers, payment of surcharges to the Gas Research Institute, and payment of charges to upstream natural gas suppliers and transporters. In the context of TCo's Chapter 11 proceedings, these three aspects have become commonly known as the "FERC motion." An evidentiary hearing on the FERC motion was held on October 17, October 22, and November 27, 1991. The FERC motion was supported and op-

posed by many parties, and the Court has been flooded with briefing. The Court appreciates the efforts of the parties to coordinate their posthearing briefing so as not to repeat argument.

The central dispute concerns whether certain monies TCo controls are property of the estate, and whether TCo may, consistent with the Bankruptcy Code, pay certain unsecured pre-petition obligations in advance of a confirmed plan of reorganization. This is the Court's opinion on this core proceeding. 28 U.S.C. § 157(b)(2)(A); § 157(b)(2)(M).

## I. *Customer Refund and GRI Facts*[1]

TCo is an interstate transporter and seller of natural gas. It purchases gas from upstream pipeline suppliers and gas producers. TCo also transports gas from upstream suppliers to customers of the suppliers.

TCo sells gas to either local distribution companies or other transporters (customers). About 50% of its customers are affiliated with TCo or Columbia Gas Systems, Inc. None of these affiliates are in a Chapter 11 proceeding.

For each business relationship, TCo has executed a contract, relating to either the purchase, storage, transportation or sale of gas. Contract quantities are in units of decatherms (a measure of the amount of gas needed to produce a certain amount of heat). The rate TCo charges to each customer generally differs. TCo sells or transports about one billion decatherms of gas per year.

### A. The Federal Regulatory Scheme

TCo's interstate gas operations are subject to the Natural Gas Act, 15 U.S.C. § 717 (1984). The NGA grants various powers to FERC, including the ability to set rates and charges. 15 U.S.C. § 717c (1984). Subsection 717c(a) establishes a framework for FERC rate-making authority: "All rates and charges made, demanded, or received by any natural-gas company ... shall be just and reasonable, and any

rate or charge that is not just and reasonable is ... unlawful."

FERC's general ratemaking procedure is set out in 18 C.F.R. Part 154 (1991). If FERC determines that a rate TCo is charging a customer is too low, FERC cannot retroactively increase the rate that TCo charges a customer. § 717d; *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). Instead, FERC adjusts for the discrepancy on a dollar-for-dollar basis in prospectively setting TCo's rates. If FERC determines that a rate TCo is charging a customer is too high, FERC can order payment of refunds, as well as adjust rates prospectively. A compilation of the rates TCo charges its various customers along with copies of its service agreements comprises TCo's "tariff," a multi-volume book. The gas suppliers are also subject to FERC's rate-making authority and thus the rates *they* charge are subject to periodic review and modification. TCo's contracts with its downstream customers usually incorporate the applicable terms and conditions from its tariff.

TCo's gas rate for each customer consists of two components: the purchased gas adjustment (PGA) component and the general rate component. The PGA component reflects the cost of gas (price per decatherm times decatherms sold) TCo purchases from each supplier. TCo cannot predict its exact PGA costs. In order to track actual versus estimated PGA costs, FERC requires TCo to file estimated purchase costs every three months. The PGA filings are reconciled annually with TCo's actual purchase costs, and FERC adjusts TCo's PGA rates accordingly. TCo is not usually allowed to profit from the purchased gas component of its rates. While not required by the NGA, the PGA method of tracking certain costs has been used extensively in the gas industry since 1972. *See generally* 18 C.F.R. §§ 154.301–310 (1991). The industry recognizes that this method allows TCo to "pass through" its PGA costs to its customers.

---

1. While some of the discussion herein is more legal than factual in nature, it provides necessary background for the motion and is more appropriately placed here.

The general rate consists of TCo's internal non-gas costs, other charges, and a FERC-authorized rate of return (about 13% in the Fall of 1991) based upon the Federal Reserve prime rate. When TCo seeks to increase its general rate, it must file with FERC the proposed increase, with all accompanying data. Within 30 days, FERC must issue an order preliminarily allowing the new rate to go into effect, or suspending the effective date of the new rate filing up to five months.

If FERC allows the new filing to go into effect, it is "subject to refund." Subsequently, FERC conducts a due process hearing, reviews the filing, reconciles it with TCo's actual non-purchase costs, and determines whether TCo has under-recovered or over-recovered its costs for a given period of time. If FERC should subsequently determine that a rate contained in the filing is unjust, it can order TCo to refund the over-recovered amount as well as prospectively reduce the unjust rate. § 717c(e); § 717d; 18 C.F.R. Part 2 (1990). Refunds include interest from the date of collection at a rate based on the prime rate. 18 C.F.R. § 154.67(c)(2)(iii) (1991) (rolling average formula). This rate was 8.5% on October 22, 1991. Tariffs address the manner and timing of refunds.

### B. The FERC–Ordered Customer Refunds

In the mid–1980's, an industry-wide problem occurred when a significant drop in the price of natural gas caused a substantial number of contracts with above market prices between producers and pipelines to be uneconomical. FERC attempted to alleviate the financial detriment by allowing pipelines to buydown and buyout their contracts with producers. In a buydown, a pipeline pays a producer money to reform the contract. In a buyout, a pipeline pays a producer to allow the pipeline to terminate the contract. In 1987, FERC promulgated Order No. 500. This order allowed pipelines upstream of TCo to recover, subject to refund, a portion of the cost associated with the buyouts and buydowns by passing through this portion to their downstream customers. Since 1987, pipelines have been passing through Order No. 500 costs to TCo, which in turn has been passing these costs to its customers.

The promulgation of Order No. 500 resulted in extensive litigation relating to its legality, and eventually FERC promulgated a subsequent order (No. 528) intended to correct defects found to exist in Order No. 500. A complete history of the litigation of FERC Order No. 500 is contained in *Associated Gas Distributors v. FERC*, 893 F.2d 349, *reh'g denied*, 898 F.2d 809 (D.C.Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 277, 278, 112 L.Ed.2d 232, 233 (1990).

Order No. 528 contemplates that TCo's upstream pipelines will be allowed to pass through a much smaller portion of their buyout and buydown costs than allowed under Order No. 500. Thus Order No. 528 anticipates that TCo, and hence its customers, will receive thousands of distinct refunds. The refunds differ by source of the overcharge, time period of the overcharge, and customer entitled to the refund. The proceedings determining the exact amount of the refunds are ongoing. No one disputes, however, that TCo, and hence its customers, will be entitled to Order No. 528 refunds totalling approximately $134 million.

There are other FERC-ordered refunds that TCo wishes to honor. These refunds total about $26.5 million, for a grand total of $160 million that TCo seeks permission by its FERC motion to pass through to its customers. As of the date of its Chapter 11 filing, TCo had received but not passed through about $21 million in FERC-ordered refunds. Post-petition, TCo expects to receive approximately an additional $140 million in refunds. TCo must pay interest to the customers on the refunds it has received at a FERC-prescribed rate. 15 U.S.C. § 717c(e); 18 C.F.R. § 154.67(c) (1991).

### C. The Nature and Categories of the Refunds within the Context of these Proceedings

While it is not disputed that all the FERC-ordered refunds discussed here re-

late to pre-petition overcharges, the court observes that for the purposes of the FERC motion, the refunds divide into two analytical categories. First, there are those refunds for which a final FERC order exists and which TCo received pre-petition (the $21 million figure). Second, there are those refunds that TCo has received or will receive post-petition. The need for these two categories will become apparent in sections II.D–E.

### D. TCo's Cash Management and Accounting Systems

TCo's financial accounting process is based on the Uniform System of Accounts promulgated by FERC at 18 C.F.R. § 201 Subchapter F. Accounting entries are made on a monthly basis. When TCo receives a refund, it treats the refund as an increase to its assets. TCo simultaneously creates a corresponding liability on its books reflecting its obligation to the corresponding customer. As long as the refund is passed through within eight and a half months of the year in which the refund was received, TCo need not pay income tax on the refund asset.

TCo tracks the various refunds it passes through using "accounting accounts." These accounts are not actual money accounts, but are mathematical and informational mechanisms for complying with the difficult task of sorting out its refund obligations. The accounting accounts thus segregate refunds by:

1. Source of refund;
2. Legal reason for the refund;
3. Time period to which the refund relates; and
4. Designated downstream recipient of the refund.

TCo maintains on the order of 100 accounting accounts.

TCo, however, does not maintain separate bank accounts for the different categories of refunds. It uses a combined cash management system. This system receives cash from many different sources, and uses the cash without restriction. The pooling of funds allows efficient utilization of cash resources and recognizes the im-

practicalities of maintaining separate cash accounts for the many different purposes that require cash.

TCo receives refunds from upstream suppliers and transporters of gas in the form of checks, wire transfers, and billing credits. TCo normally passes through refunds in the same manner. If the FERC motion is granted, TCo will pay a portion of the refunds out of cash funds, and a portion through "billing credits" imposed upon future billings to the customers for future gas sales.

Prior to the filing of its Chapter 11 petition, TCo's normal business practice was to minimize its cash balance. Every day the excess of deposits over disbursements was computed and either invested or used to pay down short-term debt with its parent, Columbia Gas Systems, Inc. On the day TCo filed its Chapter 11 petition, it had $3.3 million in cash.

### E. Gas Research Institute Surcharges

The Gas Research Institute is a not-for-profit, tax-exempt research and scientific organization which funds research activities related to the natural gas industry. GRI does not provide any direct services to TCo. GRI derives a portion of its funding through surcharges that FERC imposes upon the sale and transportation gas. FERC regulations and orders require TCo to collect these surcharges from its customers, and to then pay these amounts to GRI within 15 days. The surcharge, 1.42 cents per decatherm, is identified in TCo's tariffs, and TCo maintains separate accounting records for the received surcharges.

### II. Discussion of the Refund and GRI Surcharge Payment Motions

TCo seeks authority to: "flow through to its customers refunds received by Transmission from its upstream pipeline suppliers relating to pre-petition overcharges in accordance with FERC orders and regulations and settlements approved by FERC." FERC motion, at 6. This motion refers to the $160 million TCo wishes to refund to downstream customers. Because of the

inchoate status of the second category of refunds, TCo does not seek to pay out all $160 million at this time, but seeks permission to pay out all category one refunds, and the refunds in the second category it has received. With respect to the refunds in the second category that TCo receives in the future, TCo seeks in substance a declaratory judgment that these refunds may be paid out without further application to this Court.

■ Equality of distribution among claimants is a central policy of the Bankruptcy Code. Similarly situated claimants should receive pro rata shares of the debtor's property, and only in the context of a confirmed plan. *E.g., Goldberg v. New Jersey Lawyers' Fund*, 932 F.2d 273, 280 (3d Cir.1991). In light of these overriding principles, TCo offers two grounds to justify the customer refund and GRI surcharge payments.

The first ground is that the pre-petition amounts are not part of the estate, and that therefore, it does not need court authorization to disburse these monies. Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). TCo controls the funds at issue and does not dispute that section 541(a)(1) applies to the funds it seeks to pay out.[2] Instead, it argues it holds the funds in trust for the customers and therefore has legal title, but no equitable interest in the funds. If so, then:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ..., becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not the extent of any equitable interest in such property that the debtor does not hold.

§ 541(d). TCo concludes, and the objectors do not dispute, that *if* TCo holds the funds in trust, the funds are not property of the estate and TCo may, consistent with the Bankruptcy Code, make the requested payments. *See, e.g., Begier v. IRS*, 496 U.S. 53, ——, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990).

In determining the nature and extent of TCo's property interest in the funds, the first issue is to what body of law the court should look. TCo has not been helpful on this choice of law issue. During two stages of briefing on the issue, it waffled between whether state or federal common law applies. The Official Committee of Unsecured Creditors of TCo, which opposes the customer refund payments, argues that state law applies.

A. Whether the Monies TCo Proposes to use for Customer Refunds and GRI Payments are Property of TCo's Estate is a Question of Federal Law.

■ While generally state law determines property interests, *e.g., Jaffke v. Dunham*, 352 U.S. 280, 281, 77 S.Ct. 307, 308–09, 1 L.Ed.2d 314 (1957) (per curiam), in specialized matters of essentially a federal character, federal common law applies. *United States v. Standard Oil Co.*, 332 U.S. 301, 307, 67 S.Ct. 1604, 1608, 91 L.Ed. 2067 (1947) (restricting *Erie* doctrine). *Matter of Lehigh and N.E. Ry. Co.*, 657 F.2d 570 (3d Cir.1981) has explored this doctrine in the context of the interstate railway system.

*Lehigh* dealt with a railroad in equity receivership that all parties treated as a reorganization/liquidation. *Id.* at 575. The railroad had ceased operations over two and one-half years prior to the receivership filing. *Id.* at 572 & n. 3. The District Court, sitting in diversity, held that interline claimants had a first priority in mortgaged assets to pay pre-receivership interline claims and thus had priority over the mortgage bondholder's secured claims in the assets.

On appeal the Court of Appeals explicitly addressed the same choice of law issue. Citing four factors, it declared that federal, not state law would apply. First, the funds

---

2. At one stage of the briefing of the FERC motion, TCo changed its position and suggested that perhaps it did not have even legal title to the funds. That position is without merit.

in question arose out of railroad operations in interstate commerce. Second, Congress enacted the Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.* and the Regional Rail Reorganization Act, 45 U.S.C. § 701 *et seq.*, thus manifesting its intent to establish a national transportation policy. Third, Congress established the Interstate Commerce Commission to regulate interstate commerce by rail. Finally, the *Lehigh* court observed that uniformity in the balancing of interline freight accounts was required to allow the nation's railway system to operate properly as a single system. *Id.* at 575. Based upon these four factors, the *Lehigh* court concluded that the issue of the interline payments "implicate wholly national concerns and should be governed by federal law." *Id.* at 576.

■ These *Lehigh* factors dictate that federal common law should be used to analyze TCo's property interest in the funds it seeks to pay out. The funds in question arose from TCo's interstate pipeline operations. Congress has enacted the Natural Gas Act to manifest its intent to establish a national policy concerning the transportation and sale of natural gas. Through the NGA, Congress established the Federal Energy Regulatory Commission to regulate these matters.

Finally, uniformity in the regulation of gas rates is important to the proper operation of the natural gas industry. Since the filing of its Chapter 11 petition, TCo has been unable to pay pre-petition customer refunds and GRI surcharges. The status of the refunds and GRI surcharges, as discussed in Section I.B. & E. *supra,* depends solely upon federal law relating to the NGA. Application of a particular state's law to resolve these payment issues would not further Congress' intent to promote a national scheme of "just and reasonable rate[s]". 15 U.S.C. § 717d(a). In short, the considerations that led the *Lehigh* court to apply federal common law of trusts apply with equal force here.

Contrary to the position of The Official Committee of Unsecured Creditors of TCo, *Federal Power Comm'n v. Interstate Gas Co.,* 336 U.S. 577, 69 S.Ct. 775, 93 L.Ed. 895 (1949) supports, and does not undermine this conclusion. In that case the Federal Power Commission (the predecessor of FERC) reduced the rates of an upstream pipeline which created a refund scenario. At issue was what body of law a federal court should apply in determining the competing rights of downstream pipelines and customers of those pipelines to the refunds. The United States Supreme Court did say that if local law provides a standard for determining competing refund rights, it should be applied. *Id.* at 583, 69 S.Ct. at 779. However, that was not the case there, nor is it the case here. Moreover, the Supreme Court observed that federal law determines the refund rights of downstream distribution companies that are subject to the Commission's jurisdiction. *Id.* at 580–81, 583, 69 S.Ct. at 778–79.

### B. Refund Monies TCo Receives are Held in Trust.

The federal common law of whether a trust relationship exists is explained in *In re Penn Central Transportation Co.,* 486 F.2d 519 (3d Cir.1973), *cert. denied,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). *Penn Central* involved a railway reorganizing under section 77 of the Bankruptcy Act. The national railway system at that time consisted of numerous railways that provided transportation for goods from the point of origin to destination. A shipper's railroad car traveled over the lines of many different railroads, and was used by each of them before it returned to the possession of the owning railroad. The railroads created a system of accounting and periodic settlement of accounts to facilitate this manner of operation. The accounting for various rail services rendered to the public and other railroads resulted in "interline accounts," and the settlement of accounts resulted in "interline balances." 486 F.2d at 521.

An interline carrier moved for an order requiring the railway to pay pre-petition interline accounts and balances. The *Penn Central* court considered the nature of the interline accounting system in ruling whether payment of such pre-petition

amounts would be allowed. It observed that the interline accounting system was essentially a system:

> [B]y which one railroad collects monies owed by shippers to both itself and other railroads. The monies collected belong only in part to the collecting railroad; as to monies owed other railroads, the collecting railroad serves merely as a receiving and transmitting agent.

*Id.* at 523–24.

The court saw the key question as whether the funds were intended to be held in trust, without reference to state law. Two factors relating to this were whether the collecting agent paid interest on monies held, and whether the monies were commingled with the general funds. In the *Penn Central* case, the absence of interest suggested a trust, while the existence of commingling suggested a debtor-creditor relationship. *Id.* at 524. The court observed that commingling has minimal significance in the extraordinary operations of interline railroads because normal operations preclude as a practical and economic matter any effective daily segregation. *Id.* at 525. It concluded, that as to freight and passenger accounts, the funds were held in trust. *Id.* at 525–527.

A second group of interline accounts at issue in *Penn Central* related to train car repair, per diem rental, and switching charge accounts. The court reasoned that these "accounts do not involve collection of money by one carrier for another. These accounts merely represent the performance of services by one railroad." *Id.* at 528. The court concluded the amounts due on these accounts were not held in trust.

The last type of interline account analyzed was the overcharge and loss and damage (overcharge) account. When a shipper discovered that the railroads overcharged him, or that he was due payments for loss of, or damage to goods shipped, he made a claim to any carrier which participated in the shipment. The carrier which paid the claim could then draw upon a draft on the responsible carrier within the same month. *Id.* at 527–28.

The *Penn Central* court found the overcharge account the most difficult to analyze conceptually. While recognizing that this account possessed some indicia of a trust fund, *Id.* at 528–29, it held that the overcharge account was not held in trust for the following reasons. First, the Interlines had argued that the overcharge amounts must be paid immediately to comply with specific statutory requirements. The court found no such requirements to exist. Instead, the payment scheme resulted from a voluntary set of rules the Association of American Railroads promulgated. Second, when the debtor railway received the freight payment, "it had *no notice that at a later date part of those sums would have to be returned.*" *Id.* at 528–29 (emphasis added).

 TCo has satisfied the *Penn Central* standards for proving the refunds are held in trust when received. Commingling of the actual funds, as in *Penn Central*, has minimal significance here due to the nature of TCo's business and the impracticalities and administrative burdens of maintaining actual separate accounts for each type of refund. In contrast with the car repair, rental and switching accounts in *Penn Central*, the refunds do not equate with the unpaid performance of goods or services. The refund procedure *does* involve the collection of money by one entity for another.

Finally, the refunds starkly contrast with the overcharge accounts at issue in *Penn Central*. Here, the payment procedures are not voluntary, but are mandated by federal law. More importantly, because all rates are approved "subject to refund," TCo *is* on notice that at a later date, a portion of the monies it receives may have to be disgorged.

**C. GRI Monies TCo Received were Held in Trust.**

 TCo seeks authority to: "pay pre-Petition charges to FERC and the Gas Research Institute, which charges are fully recoverable by Transmission from its customers under separately identifiable surcharges in its Tariff." FERC motion, at 5.

At issue here is approximately $1.8 million TCo has collected from its sales and transportation customers for the months June and July 1991. All monies collected before this time were paid to GRI prior to TCo's Chapter 11 filing. All monies collected post-petition TCo has paid or will pay on a month to month basis. 11 U.S.C. § 365(d)(3).

After considering the same factors discussed in connection with the refunds, the court finds TCo has satisfied its burden that GRI surcharges when received are held in trust. These surcharges involve the collection of money by TCo from its customers for a third party. The customers are not paying TCo for goods or services. Finally, the GRI surcharge is separately identified in TCo's tariff.

### D. TCo's Ability to Pay Surcharges to the GRI and Category One Refunds to its Customers is Limited by the Lowest Intermediate Balance Rule.

Application of *Penn Central*, however, does not end the analysis of the FERC motion. In *Penn Central*, there were always sufficient general funds to pay the trust claims and therefore that court's finding of a trust fund was sufficient to allow the freight and passenger interline payments. Here, however, as will be discussed, sufficient funds to pay the trust claims do *not* always exist. Therefore, the court's finding of a trust relationship between TCo and its customers and the GRI is *not* sufficient to allow the refund and GRI payments. The *Lehigh* case conveniently provides the additional federal common law of trusts necessary to resolve the issues the FERC motion raises.

In *Lehigh*, the mortgage bondholder (Central Jersey Industries) had objected to the proposed payment of the interline claims and had proved that there had been a complete dissipation of funds with which the trust funds were commingled. Therefore, the *Lehigh* court found that the "dissipation of trust" rule applied:

'The basic idea of the trust doctrine as applied in bankruptcy is a fair and reasonable identification of the property or fund so as not to harm other creditors.... [T]he claimant must assume the burden of ascertaining and tracing the trust property....'

*Id.* at 579 (quoting *Sonnenschein v. Reliance Ins. Co.*, 353 F.2d 935, 936–37 (2d Cir.1965)).[3] The court also found that this rationale applied to secured as well as unsecured creditors. Since the *res* of the mortgaged assets could neither be identified with nor traced to interline payments, the *res* was not held in trust.

The dissipation of trust rule accords with federal common law in other Circuits and as originally established by the United States Supreme Court. As the First Circuit Court of Appeals recently stated:

The normal rule for construing trust proceeds commingled in a bank account is known as the 'lowest intermediate balance test.' Under that test, set down by the Supreme Court in *Schuyler v. Littlefield*, 232 U.S. 707 [34 S.Ct. 466, 58 L.Ed. 806] (1914), and *Cunningham v. Brown*, 265 U.S. 1 [44 S.Ct. 424, 68 L.Ed. 873] (1924), a court will [allow trust proceeds to be paid] where the amount on deposit has at all times since the commingling of the funds equaled or exceeded the amount of the trust fund. Where, however, after the commingling, all the money is withdrawn, the trust fund is treated as lost, even though later deposits are made into the account. Should the amount on deposit be reduced below the amount of the trust fund but not depleted, the claimant is entitled to the *lowest intermediate balance* in the account.

*Conn. Gen. Life Ins. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir.1988) (other citations omitted) (emphasis added). *See generally* 4 *Collier on Bankruptcy* ¶ 541.13, at 541–79 (1991); V A.W. Scott & W.F. Fratcher, The Law of Trusts, § 518, at 634–636 (4th ed. 1989).

---

**3.** TCo's suggestion that this Court's decision in *In re Delaware & Hudson Ry. Co.*, 127 B.R. 756 (Bankr.D.Del.1991) relaxed this tracing requirement is without merit.

■ TCo has more than met its burden of fairly and reasonably identifying the refund obligations it wishes to honor. TCo initially identifies the refund obligation when it receives a FERC-ordered payment from upstream. TCo continues to fairly and reasonably track each obligation as it arises through TCo's 100 accounting accounts, which provide detailed information available about each refund. TCo will employ the same practices for refunds it receives in the future.

In reference to the motion to pay GRI surcharges and the first category of customer refunds, however, TCo has only partially satisfied its burden of tracing the property it seeks to use to make the payments. TCo has identified monies as trust funds only to the extent of its lowest intermediate cash balance. On July 31, 1991, the date it filed its Chapter 11 petition, TCo had only $3.3 million in cash. This figure presents the lowest intermediate balance, and reduces TCo's ability to pay refunds received as of that date (which totalled about $21 million) and GRI surcharges (about $1.8 million) to that amount. Therefore, TCo may pay these obligations only on a *pro rata* basis in an amount not exceeding $3.3 million.

### E. TCo May Pay Category Two Refunds.

■ As for the second category of refunds, the objectors neither argued nor presented evidence, as Central Jersey did in *Lehigh,* that the lowest intermediate balance rule operates to deny any or all of the relief TCo requests. That is, no evidence exists that post-petition, TCo's refund obligations were or will be less than its cash balance. Quite the contrary, TCo proved it received $100 million in September, had $172 million in liquid funds at the end of September, and that its cash balance has only increased since then. TCo also presented explicit evidence that its cash balance is sufficient to pay its present and future refund obligations. This record is sufficient to prove that post-petition, there is no reason to limit TCo's ability to pay refunds.

### F. The "Necessity of Payment" Doctrine is Not Applicable.

#### 1. *Customer Refunds*

■ Because sections II.D–E. grant the refund and GRI aspects of TCo's FERC motion only in part, it is necessary to address TCo's second ground for its FERC motion. This ground relies upon sections 105 and 1108 of Title 11. Section 105(a) in relevant part states: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Section 1108 states: "Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business." In this Chapter 11 proceeding, no trustee has been appointed, and TCo is in possession of its own business. Reading sections 105(a) and 1108 together then, TCo's contention is that the payments are necessary or appropriate for TCo to operate its business and to aid its reorganization. This begs the question of the appropriate standard for allowing payment of a pre-petition obligation where the monies for the payment are property of the estate.

The *Lehigh* court was faced with the same question in the context of whether interline creditors could be paid out of the corpus of mortgaged property. 657 F.2d 570, 581. The court reiterated the "necessity of payment" doctrine that applies in the Third Circuit. If payment of a pre-petition claim "is essential to the continued operation of [debtor], payment may be authorized." *Id.* While the *Lehigh* court further detailed this standard, it is not necessary to do so here.

In connection with the customer refund aspect of its motion, TCo alleges that "failure by TCo to provide these refunds to its customers *could* severely jeopardize its relationships both with its customers and the FERC." FERC motion, at 18 (emphasis added). These allegations were never proven. Indeed, in its post-hearing proposed findings of facts, TCo did not even suggest that these allegations had been proven.

Moreover, these allegations are insufficient as a matter of law.

### 2. *GRI Surcharges*

While TCo has asserted that the necessity doctrine applied to the GRI aspect of its FERC motion, no evidence was presented that supports this ground.

### III. *TCo May not Pay Upstream Pipeline Charges*

#### A. Upstream Pipeline Facts

TCo is itself a customer vis-a-vis its upstream gas suppliers. The rates it pays include upstream costs relating to transportation, the PGA, and Order No. 500 charges. Since April 1, 1991, TCo's costs relating to upstream pipeline transportation charges have been itemized separately in its tariff, in the Transportation Cost Recovery Adjustment provision. TCo's TCRA costs are recovered on a dollar-for-dollar basis from its customers, and are also subject to refund. TCRA charges are separately accounted for in its gas rates through a tracking mechanism. As a result of the rate making process, TCo incorporates into the rates it charges its customers these three types of upstream charges.

#### B. Discussion of the Upstream Payment Motion

TCo's FERC motion seeks authority to:

[P]ay pre-petition charges billed to Transmission by its upstream pipeline suppliers and transporters (including affiliates) under their FERC Tariffs and Orders for services which are necessary to meet Transmission's delivery obligations, which charges are fully recoverable by Transmission from its customers.

FERC motion, at 5. The last clause of this request refers to the fact that the charges TCo seeks to pay upstream are already fully incorporated into the rates it charges its customers. TCo's motion and briefing admits that TCo anticipates recovering these charges from its customers *after* making the upstream payments. TCo does not seek authority to pay pre-petition charges of the type described in its motion that are not recoverable from its custom-

ers. The upstream charges TCo seeks to pay total about $16 million.

TCo asserts the same two legal grounds previously discussed allow it to make the upstream payments.

### 1. *Monies for Upstream Payments are Property of the Estate.*

█ Addressing first the choice of law issue, federal common law applies. *See supra* section II.A.

Applying that law as set forth in *Penn Central* and *Lehigh* to the upstream payment motion, the Court finds that the upstream facts are entirely different from those pertaining to the customer refunds and the GRI surcharges. First, the upstream payments *are* for goods and services TCo has received.

More significant is the chronological aspect of the proposed upstream payments. The monies it would use to pay upstream suppliers have *not* been collected from downstream customers. On the contrary, TCo proposes to recover these monies from its customers *in the future.* This proposed payment timeline also means that the monies for upstream payments cannot be traced from any particular source. In short, there is no trust fund here.

### 2. *The Upstream Payments are not Necessary.*

█ TCo's second ground is that the doctrine of necessity applies to the upstream payments. TCo alleges that:

The tariffs of these upstream pipelines all have provisions which allow [upstream pipeline sellers and transporters] to suspend or abandon service or to terminate the contracts, under certain conditions, for non-payment of bills. The gas supply and transportation services of these pipelines are often necessary for TCo to meet its certificated service obligations to its customers.... If such services were interrupted or abandoned, TCo would not be able to meet the requirements of its customers during peak winter periods, and, at a minimum, would lose goodwill with its customers.... If these services are suspended, TCo may

not be able to meet its purchase obligations to producers.

FERC motion, at 11–12. TCo failed to prove these allegations.

Various other arguments have been raised in support of the FERC motion. The court has considered each, and holds each to be without merit. In particular, to the extent the supporters argue TCo holds monies in a "statutory trust," that notion is rejected. *Begier v. IRS*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1991).

### IV. *Conclusion*

TCo's motions to pay pre-petition customer refunds and GRI surcharges are GRANTED to the extent stated herein. TCo's motion to pay pre-petition upstream charges is DENIED. An order in accordance with this opinion is attached.

### ORDER

AND NOW, February 13, 1992, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1. TCo may pay category one refunds and pre-petition GRI surcharges on a pro-rata basis only to the extent of $3.3 million. TCo's motion to pay category one refunds and GRI surcharges is otherwise DENIED.

2. TCo's motion to pay category two refunds is GRANTED.

3. TCo's motion to pay pre-petition upstream pipeline charges is DENIED.